## PENNOCK *v* COMMISSIONERS.

1. Lands in Kansas held in fee-simple by a half-blood member of the tribe of Sac and Fox Indians of the Mississippi under a patent from the United States, issued pursuant to the seventeenth article of the treaty of Feb. 18 1867 (15 Stat. 495), are not exempt from State taxation.

2. *The Kansas Indians* (5 Wall. 737) distinguished.

ERROR to the Supreme Court of the State of Kansas. The facts are stated in the opinion of the court.

*Mr. George E. Peck* and *Mr. Thomas Ryan* for the plaintiff in error.

No counsel appeared for the defendants in error.

MR. JUSTICE FIELD delivered the opinion of the court.

The plaintiff, Sarah A. Pennock, is an Indian, and a member, by " birth, blood, and descent," of the confederate tribes of Sacs and Foxes of the Mississippi. At the date of the treaties of 1859 and 1867, between those tribes and the United States, she was the wife of William Whistler, a member of the same tribe. After his death she intermarried with one Henry Pennock, a white person, a citizen of the United States, and a resident of Kansas, with whom she now lives. In May, 1871, she was the owner in fee of certain lands in Franklin County in that State, which were listed and assessed by its officers for taxes in the same way as other real property in the county. The taxes and charges being unpaid, the lands were sold to pay them, and certificates of sale given. To restrain the issue of deeds to the purchasers, and to set aside the tax sale as illegal, the present suit was brought. The District Court of the

county held the sale illegal, and gave a decree for the plaintiff. The Supreme Court of the State reversed the decree and rendered judgment for the defendants, and the plaintiff has brought the case, on writ of error, to this court.

It is admitted in the record that the plaintiff, though residing with her husband in Kansas, keeps up her relations with her tribe, and the question is presented whether under these circumstances her lands in Kansas are exempt from taxation by that State. With some exceptions not applicable to them, other property within its limits, real and personal, is subject to taxation. The solution of the question depends upon the construction given to the treaties between the United States and the tribes mentioned.

By the treaty concluded with them in October, 1842, they ceded to the United States all the lands west of the Mississippi River to which they had any claim or title, or in which they had any interest. In consideration of the cession it was, among other things, agreed that the United States should pay to them an annual interest of five per cent on $800,000, and discharge certain debts which they had contracted, and that the President should assign to them a tract of land on the Missouri River, or some of its waters, suitable and convenient for Indian purposes, "for a permanent and perpetual residence for them and their descendants." 7 Stat. 596. Pursuant to this latter provision, the President soon afterwards assigned to them a tract of land on the Missouri River, afterwards known as their reservation, situated within what are now the limits of the State of Kansas. The lands were held by them in common until 1860. In the mean time, white settlements had sprung up around them, and they had adopted many of the habits and customs of the white people. It was by comparison of their own condition with that of their white neighbors — at least we may so infer from what subsequently occurred — that they were induced to believe that the continued ownership of their lands in common was not beneficial to them, and that their prosperity would be promoted if limited quantities were held by individuals in severalty. This consideration led to a new treaty, which was concluded on the 1st of October, 1859, and ratified in July, 1860. 15 id. 467. It recited that the tribes

had more lands than were necessary for their occupancy and use, and that they were anxious to promote " habits of industry and enterprise amongst themselves by abolishing the tenure in common " by which they held their lands, and " by assigning limited quantities thereof in severalty to the individual members of the tribes, to be cultivated and improved for their individual use and benefit," and it stipulated, among other things, that a portion of their reservation, amounting to 153,600 acres, should be set apart and retained for that purpose ; and that out of it there should be assigned to each member of the tribes, without distinction of age or sex, a tract of eighty acres. It declared that these tracts should not be aliened in fee, leased, or otherwise disposed of by the parties to whom they were assigned, except to the United States or to members of the tribes, and then under such rules and regulations as might be prescribed by the Secretary of the Interior, and that they should be exempt from taxation, levy, sale, or forfeiture, until otherwise provided by Congress.

In order to establish the members of the tribes upon the lands thus assigned to them in severalty, by building them houses and furnishing them with agricultural implements, stock animals, and other necessary aid and facilities for commencing agricultural pursuits under favorable circumstances, the treaty further provided that the lands in the reservation of the tribes which were not thus set apart and retained should be sold, under the direction of the Secretary of the Interior, and the proceeds expended for those purposes, and to pay the debts of the tribes and of the individual members thereof.

These stipulations, which are set forth in the first five articles of the treaty, would be deemed to apply to all members of the confederate tribes, but for the special provisions contained in article 10. The latter relate exclusively to such members as were either " mixed and half bloods," or women, being whole-bloods, who had intermarried with white men. To each of them three hundred and twenty acres were to be assigned from that portion of the land relinquished by the treaty to the United States in trust, provided the parties desired to take such tracts. The lands thus granted were to remain inalienable except to the United States or members of the tribes, and

the grantees were not to participate in the proceeds of the land sold. This article operates as a limitation upon the provisions of the previous articles, and confines them to members of the tribes other than the mixed or half bloods, or the females inter-married with white men. These parties, by accepting the grant of the tenth article, were excluded from the benefits and freed from the restrictions of the other articles, except as they were repeated in it. Under it various tracts of the quantity specified were assigned to the parties coming under the classes designated, and, among others, to Mrs. Pennock, — who is of mixed and half blood, — the plaintiff in this suit, at the time the wife of William Whistler.

In February, 1867, another treaty was concluded with the Sacs and Foxes, which was ratified in October, 1868. 15 id. 495. By it they ceded to the United States all the lands in Kansas to which they had any claim, and agreed to remove to the Indian Territory, where the United States promised to give them for their future home another tract of land. The treaty provided for their removal, the payment of certain debts con-tracted by them, the erection of various buildings for their use, and other measures designed for their improvement and civiliza-tion. It also allowed various parties to select half and quarter sections of land, and provided for the issue of patents to them. Article 17 declared that the half-breeds and full-bloods, who were entitled to selections of land under the treaty ratified in July, 1860, and whose selections had been approved by the Secretary of the Interior, should be entitled to patents in fee-simple for the lands selected, according to certain schedules annexed.

Under this treaty the tribes removed to the Indian Territory, where they now reside, and under the seventeenth article patents were issued to Mrs. Pennock, under her former name of Sarah A. Whistler, and to other parties of a like class, for the tracts of land severally assigned to them under the tenth article of the treaty ratified in July, 1860. Mrs. Pennock did not accompany her tribe, but remained with her white husband in Kansas, having an indefeasible and absolute title to the lands covered by her patent, and having acquired by purchase other tracts from parties to whom similar patents had been

· issued. She had renounced all claim to share in the proceeds of lands in the reservation sold by the United States, by accepting the grant under the tenth article of that treaty. Her subsequent relation to her tribe, as a member of it, if she chose to keep it up, cannot affect the jurisdiction of the State over her property for governmental purposes. She might have followed her tribe, — she can now do it; but as that tribe, under a treaty with the United States, has left the State, while she remains, and has taken, not an imperfect title, to be held under the guardianship of the Secretary of the Interior, to be disposed of only to the United States, under regulations to be prescribed by him, but a title carrying with it absolute ownership, with a right of free disposition at her will, she and her property have come under the control of the State, and are subject to its laws, entitled to its protection, and bound to bear a portion of its burdens.

The eighteenth article of the treaty does not, in our judgment, apply to the lands covered by the patent to the plaintiff, or by the patents to the other parties from whom she purchased. Its language is that "All sales hereafter made by or on behalf of persons to whom lands are assigned in this treaty shall receive the approval of the Secretary of the Interior before taking effect or conveying title to lands so sold." This language strictly considered would, it is true, place a limitation upon all subsequent sales, by or on behalf of *persons* to whom lands were assigned under the treaty; but we think the restriction was only intended to apply to the alienation of the *lands* thus assigned, and not to other lands which such persons may have had assigned to them by other treaties. And we are also of opinion that the restriction upon alienation only applies to lands where the sole title of the holder is by the assignment made. When the patent of the government is once issued for the lands, all restrictions upon their alienation, not expressly named, are gone. Without such designation, inability to alienate the property would be inconsistent with the perfect title which accompanies the patent.

There is nothing in the case of *The Kansas Indians*, reported in 5th Wallace, in conflict with these views. There the Indians resided in tribes, though their tribal organizations had been

much broken in upon by their intercourse with the whites. Patents to individual members, enabling them to hold lands in severalty, were accompanied with a condition against alienation without the consent of the Secretary of the Interior. A treaty of the United States with one of the tribes stipulated that their lands should not be liable to "levy, sale, execution, or forfeiture," — terms which were held to prevent a levy and sale by officers of the State for taxes, as well as a levy and sale under judicial proceedings. And the act admitting Kansas into the Union as a State provided that the rights of the Indians in the Territory should remain unimpaired, and the general government be at liberty to make any regulation respecting them and their lands which it would have been competent to make had Kansas not been thus admitted. Their tribal organizations continuing in the State, and the United States treating with them as distinct political communities, the legislature of Kansas could not interfere with their lands or the lands of individual members of the tribes, and subject them to taxation.

*Judgment affirmed.*