THE AUDITOR GENERAL v. SARAH WILLIAMS.

*Indians—Grant of land in severalty—Restriction against alienation —Authority of State to tax.*

1. Land patented to a "not-so-competent Indian," under a treaty prohibiting its alienation by the patentee without the consent of the government, which provision is incorporated in the patent, is not subject to taxation.
2. Under a patent to a "not-so-competent Indian," in which the power of alienation is suspended except with the consent of the Secretary of the Interior, the patentee has a right to the use, occupancy, and enjoyment of the land, but has not the right to alienate it, either by direct or indirect means.

Appeal from Isabella.    (Hart, J.)    Argued November 17, 1892.    Decided December 22, 1892.

Petition for the sale of lands delinquent for taxes under Act No. 195, Laws of 1889.    Petitioner appeals.    Decree affirmed.    The facts are stated in the opinion.

*H. A. Sanford,* Prosecuting Attorney, for appellant, contended:

1. Under the treaty of 1855, the tribal relation, except so far as necessary for the purpose of carrying into effect the provisions of the treaty, was dissolved, and since said treaty Indians have

been citizens of Michigan under section 1, article 7, of the Constitution; and as soon as the tribal relation is surrendered, the State acquires jurisdiction; citing *Love v. Pamplin,* 21 Fed. Rep. 755; *The Kansas Indians,* 5 Wall. 737.

2. The land was severed from the public domain by the treaty, and when the patent was issued it came within the jurisdiction of the State; citing Cooley, Tax'n, 60; and property of every description under the jurisdiction of a state is subject to state taxation; citing *Carroll v. Perry,* 4 McLean, 25; *Investment Co. v. Parrish,* 24 Fed. Rep. 197; *Edgington v. Cook,* 32 Neb. 551; 1 Kent, Comm. 426; Cooley, Tax'n, 56; and this is true of both legal and equitable estates; citing *Astrom v. Hammond,* 3 McLean, 107; and public land, the legal title to which remains in the United States, but which equitably belongs to private owners who are entitled to a patent, is taxable by state authority; citing *Railroad Co. v. Comstock,* 71 Wis. 88.

3. The fact that the Indian may use the tax sales as a means of alienating his land can have no effect upon the right to tax the land; citing *Robertson v. Commissioner,* 44 Mich. 274.

4. No property is beyond the reach of the taxing power unless put beyond it designedly, and by an unequivocal act of the sovereign power; citing *Robertson v. Commissioner,* 44 Mich. 276; *Church v. Philadelphia,* 24 How. 302; *Gilman v. Sheboygan,* 2 Black, 513; *Bank v. Billings,* 4 Pet. 514; *U. S. v. Ward,* 1 Woolw. 17; *The Kansas Indians,* 5 Wall. 737; *Indianapolis v. McLean,* 8 Ind. 328; Cooley, Tax'n, 54, 66.

*T. F. Shepard,* U. S. Attorney, and *I. A. Fancher,* for defendant.

DURAND, J. The petition was filed in this case by the Auditor General under section 52, Act No. 195, Laws of 1889, praying for a decree in favor of the State of Michigan against certain lands in Isabella county for the taxes of 1889, among which lands are those of the defendant, being the S. W. ¼ of the S. E. ¼ of section 24, in township 15 N., range 4 W. The defendant, who is an Indian woman of the Chippewas of the Saginaw, Swan Creek, and Black River Indians, filed her objections to the tax, claiming that her land was not taxable, for the reason that it was patented to her on February 9, 1885, under and by

virtue of the treaties of August 2, 1855, and October 18, 1864, between the United States and the Chippewas of Saginaw, Swan Creek, and Black River, in which patent she was denominated as a "not so competent," and which contained a clause "that the land shall never be sold or alienated to any person or persons whomsoever, without the consent of the Secretary of the Interior for the time being." It is admitted that she is the patentee under such patent, and that the Secretary has not removed the disability of "not so competent," mentioned therein; that he has not authorized the alienation of the land; that she has not applied to him for the removal of such disability; and that this land is a part of the lands set apart by the United States for the Indians, under the treaties referred to.

The treaty of October 18, 1864, among other things, contains the following:

"So soon as practicable after the ratification of this treaty, the agent for the said Indians shall make out a list of all those persons who have heretofore made selections of lands under the treaty of August 2, 1855, aforesaid, and of those who may be entitled to selections under the provisions of this treaty, and he shall divide the persons enumerated in said list into two classes, viz., 'competent' and 'those not so competent.' Those who are intelligent, and have sufficient education and are qualified by business habits to prudently manage their affairs, shall be set down as 'competents,' and those who are uneducated, or unqualified in other respects to prudently manage their affairs, or who are of idle, wandering, or dissolute habits, and all orphans, shall be set down as 'those not so competent.' The United States agrees to issue patents to all persons entitled to selections under this treaty as follows, viz.: To those belonging to the class denominated 'competents,' patents shall be issued in fee-simple; but to those belonging to the class of those 'not so competent,' the patent shall contain a provision that the land shall never be sold or alienated to any person or persons whomsoever, without the consent of the Secretary of the Interior for the time being."

The act of Congress of July 13, 1787, entitled "An ordinance for the government of the territory of the United States northwest of the River Ohio," provides that the states which may afterwards be formed therein—

"Shall never interfere with her primary disposal of the soil by the United States in Congress assembled, nor with any regulations Congress may find necessary for securing the title in such soil to the *bona fide* purchasers. No tax shall be imposed on lands the property of the United States."

This clause of the ordinance of 1787 was retained and embodied in the fifth proposition of the act of Congress of June 15, 1836, providing for the admission of the State of Michigan into the Union; and one of the conditions imposed by this portion of the act was—

"That the legislature of the said State, by virtue of the powers conferred upon it by the convention which framed the Constitution of the said State, shall provide by an ordinance, irrevocable without the consent of the United States, that the said State shall never interfere with the primary disposal of the soil within the same by the United States, nor with any regulations Congress may find necessary for securing the title in such soil to the *bona fide* purchasers thereof, and that no tax shall be imposed on lands the property of the United States."

The assent to these propositions by the Legislature of Michigan was given in an act passed by it and approved July 25, 1836, an excerpt from which reads as follows:

"For the purposes of complying with the conditions in the proviso to the fifth proposition contained in the above-recited act, and by virtue of the powers conferred upon the said Legislature of said State by the convention aforesaid, the following ordinance is declared to be irrevocable without the consent of the United States:

"'Be it ordained by the Senate and House of Representatives of the State of Michigan, that the said State shall never interfere with the primary disposal of the soil within the same by the United States, nor with any regulations Congress may find necessary for securing the title in such

soil to the *bona fide* purchasers thereof; and that no tax. shall be imposed on land the property of the United States.' "

This compact, thus solemnly entered into between the United States and the State of Michigan, after much discussion, and after important concessions made upon both sides, must be recognized as of the very highest character, and a full and honest compliance with the spirit as well as the letter of its terms is demanded. So far as we have been able to discover, this State has never by legislative action attempted to ignore any portion of the obligations imposed by the clause referred to, nor to put a narrow or illiberal construction upon it; and, so far as taxation is concerned, it has by express enactment exempted all public property of the United States from State taxation. In view of the several acts and ordinances referred to, it will be conceded that, at the time the defendant obtained her patent, the land mentioned in it was not subject to State taxation; and the question now presented is whether the United States by that instrument disposed of all its control and interest in the land to the patentee, or whether the condition against alienation is such a regulation as the State has a right to ignore or interfere with, when the scope and effect of the above-mentioned compact is given consideration. If so, there can be no doubt of the right of the State to impose taxes upon it; but if, on the other hand, the restriction against alienation contained in the patent is in pursuance of a regulation which the government had authority to make in the exercise of its watchful care for the Indian to whom the conveyance was made, then the land would not be amenable to taxation, for the reason that the State, by the legislation quoted, is bound never to interfere with the primary disposition of the soil within the same by the United States, nor with any regulation necessary for securing the title in such soil to the

*bona fide* purchasers thereof. That the restriction against alienation contained in the patent is reasonable, and one which the government had a right to reserve when making a primary disposition of the land to Indians of the class known as "those not so competent," we have no doubt; and it may well be inferred that this right was understood by the high contracting parties to the compact relating to the admission of Michigan into the Union to have been inherent in the United States, and one which states subsequently established within the limits of the Northwest Territory would be bound in honor to maintain, for it is provided in article 3 of the ordinance of 1787 that—

"The utmost good faith shall always be observed towards the Indians. Their lands and property shall never be taken from them without their consent, and in their property rights and liberty they never shall be invaded or disturbed unless in just and lawful wars, authorized by Congress; but laws founded in justice and humanity shall from time to time be made for preventing wrongs being done to them."

In the case of *Goodell v. Jackson*, 20 Johns. 715, Chancellor Kent says that in the early days of the republic the government watched with great anxiety over the property of the Indians intrusted to its care, whether owned by tribes or families or individuals. If it was Indian property in land, it had a right to protection from us against our own people. And the Supreme Court of the United States in *U. S. v. Kagama*, 118 U. S. 375 (6 Sup. Ct. Rep. 1109), asserted—as they have practically done in many other cases—that the Indians are wards of the nation, and under the paternal superintendence of the government. It was in the faithful observance of this duty that the government made a distinction between the Indians, denominating some as "competent" and others as "those not so competent," and, in order to protect the latter

class from their own folly, inexperience, and weakness, as well as to guard them against the schemes of designing men, it placed a restriction against the alienation of the interest in the land conveyed by the patent.

It is contended that, while this restriction is a proper exercise of power for the protection of the helpless class in whose behalf it is exercised, and while it is effectual to prevent the patentee from making a disposition of the land, unless authorized by the Secretary of the Interior to do so, yet the alienation can be accomplished through the machinery of State taxation. If this be so, the whole purpose and object of the restriction will count for nothing; for by neglecting to pay the tax assessed against the land, either through his own lack of capacity to comprehend that his land may be taken away from him by a tax sale if he does not pay, or because he may be advised by interested parties not to pay it, so that the same result may be accomplished, the alienation which the government, by the restriction placed in the patent, has sought to avoid, is as certainly effected as though made by a deed given by the Indian under his own hand, and he would thus be able to perform by indirection that which he could not directly do.

The case of *Pennock v. Commissioners*, 103 U. S. 44, is unlike this, for the reason that in that case there was no restriction against alienation, and, although the patentee was an Indian, and kept up her relation with the confederate tribes of the Sacs and Foxes, of which she was a member, the court held that, inasmuch as her title was absolute, the land was subject to taxation under the laws of Kansas; and in rendering the opinion Mr. Justice Field says that under her patent she took, "not an imperfect title, to be held under the guardianship of the Secretary of the Interior, to be disposed of only to the United States under regulations to be prescribed by him, but a

title carrying with it absolute ownership, with a right of free disposition at her will;" and it was therefore held that under those circumstances her property had come under the control of the state, and was subject to its laws, entitled to its protection, and bound to bear a portion of its burdens.    For the reasons stated the same rule could not apply as was applied in the case of the *Kansas Indians,* reported in 5 Wall. 737, where it was held that the state of Kansas has no right to tax land held in severalty by individual Indians of the Shawnee, Wea, and Miami tribes under patents issued to them by virtue of treaties made with those tribes respectively in 1854.    The tribal organization of those tribes had to a certain extent been broken in upon by intercourse with the whites, in the midst of whom the Indians were, and by their enjoyment to some extent of the social and other advantages of the white people.    The patents issued in severalty to individual members of the Shawnee and Wea tribes, like the one in this case, contained a restriction against alienation, unless with the consent of the Secretary of the Interior, and those issued to the Miamis also contained the same restriction, and, in addition, a provision exempting the lands from levy, sale, execution, and forfeiture.    Although the facts were somewhat different in each case, because the treaties with those tribes were not all alike, yet Mr. Justice Davis held that in all three cases the land was exempt from state taxation.    In doing so he says:

"It is insisted, as the guaranties of the treaty of 1831 are not in express words reaffirmed in the treaty of 1854, they are therefore abrogated, and that the division of the Indian territory into separate estates so changes the *status* of the Indians that the property of those who hold in severalty is liable to state taxation.    It is conceded that those who hold in common cannot be taxed.    If such are the effects of this treaty, they were evidently not in the contemplation of one of the parties to it, and it could never have been intended by the government to make a

distinction in favor of the Indians who held in common, and against those who held in severalty."

Enlarged rules of construction are adopted in reference to Indian treaties; and in speaking of these rules in *Worcester v. Georgia*, 6 Pet. 582, it was said:

"The language used in treaties with the Indians should never be construed to their prejudice. If words be made use of which are susceptible of a more extended meaning than their plain import, as connected with the tenor of the treaty, they should be considered only in the latter sense."

While the circumstances are somewhat different in each case, yet a careful reading of the cases referred to will show that the courts have been zealous in sustaining the efforts put forth by the government to prevent its "non-competent" Indian wards from being deprived of the land granted to them in severalty, either through their own volition, through process of law, or by state taxation. While the question of whether or not the existence of a tribal organization is of importance was discussed in the case of the *Kansas Indians, supra,* yet we do not consider that in any sense a controlling question here; and, if it were so, it may well be held that, in reference to the subject now being considered, that condition exists so far as this Indian defendant is concerned, for by the sixth article of the treaty of 1855, referred to, the tribal organization of the Indians is retained so far as may be necessary to give effect to the provisions of that treaty.

It is not necessary to determine here the exact extent of the title conveyed by this patent, nor what the rights of those who may inherit it from the patentee may be at some time hereafter, nor whether or not this class of Indians are citizens of the State, with the right to exercise the elective franchise. All these are questions outside of what we deem to be material to an adjudication of the rights of the parties in this case.

It is only necessary to say that under this patent from the United States the patentee has a right to the use, occupancy, and enjoyment of the land, but has not the right to alienate it, either by direct or indirect means. The power to alienate is suspended, and the government has reserved the right to say when and how an alienation may be effected. This is one of the rights the government has authority to insist upon when, in the exercise of a humane guardianship and watchful care of "non-competent" Indians, it prohibits the alienation of the land conveyed to that class in severalty; and, having done so, it has a right to insist that such alienation shall not be brought about by the execution of state tax laws. A concession of the right to effect an alienation in the manner contended for would, as we conceive it, be in direct violation of the ordinance of the Legislature of this State of July 25, 1836, which contains an agreement that this State shall never interfere with the primary disposal of the soil within the same by the United States, nor with any regulations Congress may find necessary for securing the title in such soil to the *bona fide* purchasers thereof, and that no tax shall be imposed on land the property of the United States; and which provision, by the same act, is declared to be irrevocable without the consent of the United States.

We agree with the learned circuit judge that the land in question was not subject to taxation at the time of its assessment in 1889.

It follows that the decree made by him must be affirmed.

The other Justices concurred.