SMITH et al. v. BONIFER et al.

(Circuit Court, D. Oregon. July 15, 1907.)

No. 2,683.

1. INDIANS—TRIBAL AFFILIATIONS—INDIAN LANDS—RIGHT TO ALLOTMENT.

Where the mother of P., a Walla Walla Indian, married an Iroquois, and P., who was born within the Walla Walla region, was a minor when her mother again married a French Canadian, but never severed her tribal relations, which were subsequently expressly recognized by a general Indian council, the marriage of her mother did not deprive P. of the right to select lands held for allotment in the Umatilla Indian reservation for herself and her children.

2. SAME—TRIBAL RELATIONS—TERMINATION.

The breaking off and recasting of tribal affiliations between Indians is a matter dependent on the peculiar usages and customs of each particular tribe.

3. SAME—TREATIES—INDIAN LANDS.

The Indian treaty of 1855, between the United States and certain confederated tribes and bands of Walla Wallas, Cayuses, and Umatillas, accorded to such Indians a community of interest in the right to exclusive occupancy of the lands of the Umatilla reservation, which entitled each to share in the ultimate allotment of such lands.

4. SAME—RIGHTS OF PROPERTY.

The right of the members of the confederated tribes of Walla Wallas, Cayuses, and Umatillas to share in the allotment of the Umatilla reservation under the treaty of 1855, was a right of property of which the Indians could not be divested without the express or implied consent of the individual Indian.

5. SAME—ALLOTMENT ACT—CONSTRUCTION—RESIDENCE.

Act Cong. March 3, 1885, c. 319, 23 Stat. 340, providing for the allotment of lands in the Umatilla Indian reservation, declaring that the President shall cause the lands to be allotted to the confederated bands residing on the reservation, authorized the allotment of such lands to Indians belonging to the bands in question, though not then residing on the reservation.

6. SAME—MARRIAGE—MODE OF LIFE—RIGHT TO ALLOTMENT.

A Walla Walla Indian, who had never severed her relations with her tribe, was not deprived of her right to an allotment of land in the Uma-

tilla Indian reservation under Act Cong. March 3, 1885, c. 319, 23 Stat. 340, providing for the allotment of such lands, because she married a white man and thereafter lived apart from her tribe and adopted the habits of civilized life.

7. SAME—CHILDREN—RIGHT TO ALLOTMENT.

The Indian treaty of 1855, providing for the setting apart of designated tracts of the Umatilla Indian reservation to families of Indians for permanent homes, and the allotment act of 1885, authorized an allotment to each head of a family, each single person over 18 years of age, each orphan child under that age, and each child under 18 not otherwise provided for. *Held*, that an Indian woman who was a member of one of the confederated tribes, being married to a white person, became herself the head of a family, and her children of the half-blood were entitled to allotments.

## In Equity.

The bill of complaint herein shows that complainant Philomme Smith is a full-blood Indian woman, a member of the Walla Walla band or tribe of Indians, and the wife of complainant F. A. Smith, a white person. That the complainants Charles Smith, Maggie Smith, and Janie Smith, are children of the said Philomme and F. A. Smith. That Elizabeth Smith is the child of James Smith, now deceased, who was the child of Philomme and F. A. Smith. That Lura Smith, George Smith, and Sophia Smith, who are now deceased, were also children of Philomme and F. A. Smith. That about April, 1891, there was allotted by the allotment commissioners to Martha Hebert (since Bonifer, now Snow), the N. E. ¼ of section 29, township 3 N., range 34 E. of the Willamette Meridian, being a part of the Umatilla Indian reservation; and to Margaret Bourner (since deceased), who is succeeded by her husband, Ed. Bourner, and three children, Myrtle, Violet, and Edwin, defendants herein, the N. W. ¼ of said section 29. That, long prior to such allotment, said James Smith, being above the age of 18 years, selected for himself, and settled upon and improved, the W. ½ of the N. W. ¼ of said section 29. That the said Philomme Smith selected specific tracts of the lands so allotted to Martha Hebert and Margaret Bourner for her children then under the age of 18 years, as follows: For Charles Smith, the N. E. ¼ of the N. E. ¼; for Maggie Smith, the N. W. ¼ of the N. E. ¼; for Janie, the S. E. ¼ of the N. E. ¼; and for Lura, the S. W. ¼ of the N. W. ¼ of said section 29; for George, the N. E. ¼ of the N. W. ¼; and for Sophia, the S. E. ¼ of the N. W. ¼ of said section 29. That the complainant Philomme Smith and her husband, with their family, settled upon the lands thus selected, and improved the same, with the purpose of having them allotted to the individuals as designated when allotments were to be made by the government commissioners; that such settlement had been made upon said premises at the time the commissioners made the allotments, as aforesaid, to Martha Hebert and Margaret Bourner. That the complainant Philomme Smith notified the commissioners that she and her said children were in possession of the lands designated, had the same inclosed, and that she had selected them in manner as indicated; but that, notwithstanding the said notification, the commissioners wrongfully allotted said lands to the said Martha Hebert and Margaret Bourner. The purpose of the bill is to have the allotments thus made to Hebert and Bourner set aside and canceled, and the complainants declared to be the rightful alottees thereof.

The defendants put in issue the matter touching the alleged selection of such lands by James Smith and by Philomme Smith for her minor children, the settlement thereon, and the request for allotment, and contest their right to have the allotments as made canceled.

For former opinion, see 132 Fed. 889.

R. J. Slater and J. T. Hinkle, for complainants.
Winter & Collier, for defendant Martha Bonifer.
W. C. Bristol, U. S. Atty.

WOLVERTON, District Judge. While it is conceded that the mother of Philomme Smith was a member of the Walla Walla tribe of Indians, it is contended that she severed her tribal relations, and that by reason thereof her daughter Philomme is not a tribal Indian, and was therefore not entitled to an allotment of land upon the Umatilla reservation. From this position, it is further argued that the children of Philomme, who are Indians of half blood, were also not entitled to allotments.

The testimony in the case shows beyond question that the mother of Philomme was a full-blood Walla Walla Indian woman; that she married one Thomas Tawakown, who was an Iroquois Indian, and probably came into the United States from Canada. Tawakown was engaged in trapping for the Hudson Bay Company, and traveled about from place to place wherever he was directed to go. He lived for a time in the Willamette Valley, and from there made expeditions into California and elsewhere. It is not clear as it respects the place of Philomme's birth, but I am impressed that the weight of the testimony indicates that it was within the Walla Walla region—perhaps at some point by the stream that goes by that name—and that while quite young she was brought by her parents into the Willamette Valley. Mrs. Elliot, a full-blood Indian woman, seemingly quite intelligent, who lives in Douglas county, testifies that she helped to take care of Philomme while she was very young; that Philomme was born in Walla Walla, and was brought to the Willamette Valley, the witness seeing her first when she was but three or four months old. F. A. Smith, one of the complainants, testifies that she was born in Walla Walla, but that his information comes through what he heard other people say about it. Mrs. Smith herself is not clear upon the subject, but says that her mother said she was born in the Willamette Valley. However this may be, whether she was born in the Walla Walla country or at St. Paul in the Willamette Valley, the fact is not decisive of the case. The subsequent history of Philomme is in brief this: Her father died at St. Paul when she was about six years of age, and her mother thereafter married a French Canadian by the name of Sauve. This marriage probably took place soon after Tawakown's death, as it was before Philomme reached her seventh or eighth year, at which time (and it appears to be the only time) she attended school. Sauve having died in the meanwhile, the mother and Philomme moved to The Dalles, in Oregon, when the latter was about 14 years of age. Shortly thereafter Philomme was married to Smith, her present husband. The year of Philomme's birth was about 1846—it may have been a little later or a little earlier—so that she was about nine years of age when the treaty between the confederated bands and tribes of Walla Wallas, Cayuses, and Umatillas, and the general government was entered into, and it is important that we now inquire into her status, whether a member of the Walla Walla tribe at the date of such treaty, namely, 1855. The treaty was formulated and adopted for the effectuation of several purposes. Among them were to extinguish the Indian title to all those lands described by the treaty, to set aside the Umatilla reservation for the exclusive use of these confederated tribes, and eventually to secure for the individual mem-

bers of those tribes allotments in severalty. The unalterable policy of the government has long been to encourage the Indians to abandon their primitive habits and customs, to break up their tribal relations and affiliations, and to adopt the arts and methods of the civilized races. This treaty is only one among many adopted, both earlier and later, looking to the ultimate achievement of these ends; and so it may be further premised that the allotment act of March 3, 1885, pertaining to the segregation of the lands of the reservation among the Indians settled thereon, is in furtherance of the cardinal purpose and policy of the government. Indians members of one tribe can sever their relations as such, and may form affiliations with another or other tribes. And so they may, after their relation with a tribe has been severed, rejoin the tribe and be again recognized and treated as members thereof, and tribal rights and privileges attach according to the habits and customs of the tribe with which affiliation is presently cast. As to the manner of breaking off and recasting tribal affiliations we are meagerly informed. It was and is a thing, of course, dependent upon the peculiar usages and customs of each particular tribe, and therefore we may assume that no general rule obtains for its regulation.

Now, the first condition presented is that the mother of Philomme was a full-blood Walla Walla Indian. She was consequently a member of the tribe of that name. Was her status changed by marriage to Tawakown, an Iroquois Indian? This must depend upon the tribal usage and customs of the Walla Wallas and the Iroquois. It is said by Hon. William A. Little, Assistant Attorney General, in an opinion rendered the Department of the Interior in a matter involving this very controversy:

"That inheritance among these Indians is through the mother and not through the father, and that the true test in these cases is to ascertain whether parties claiming to be Indians and entitled to allotments have by their conduct expatriated themselves or changed their citizenship."

But we are told that:

"Among the Iroquoian tribes kinship is traced through the blood of the woman only. Kinship means membership in a family; and this in turn constitutes citizenship in the tribe, conferring certain social, political, and religious privileges, duties, and rights, which are denied to persons of alien blood." Handbook of American Indians, edited by Frederick Webb Hodge, Smithsonian Institute, Government Printing Office, 1907.

Marriage, therefore, with Tawakown would not of itself constitute an affiliation on the part of his wife with the Iroquois tribe, of which he was a member, and a renunciation of membership with her own tribe. Furthermore, no testimony has been adduced indicating that Tawakown ever took his wife with him to live with his own people. Nor does the further fact that Tawakown was a trapper in the employ of the Hudson Bay Company, and went from place to place where his occupation called him, and that his wife accompanied him, signify a change of status upon the part of either. With all this there may have been an abiding purpose of returning to the habitation of either the one tribe or the other, and there is yet here not sufficient evidence of the intention to renounce tribal relations. And, again, bearing in mind the presumption that obtains that a thing or condition once proven to exist

continues in the same relation as things and conditions of that nature are wont to continue or remain, the proofs fall far short of establishing a different tribal relation for the wife of Tawakown, the mother of Philomme, than that which we find to have existed 'at the time of her marriage.

The next feature of the controversy to be noted is the marriage of Philomme's mother to Sauve, a French Canadian. Of Sauve we know but little. Presumably, he was engaged in civilized pursuits, and his wife, being with him, had adopted his habits and customs in that regard. But this condition did not affect the daughter of Tawakown, who was then a minor, a mere child, without volition to disengage her tribal affiliations, or to cast them elsewhere, or to assume the civilization of the white man in a sense to carry with it a legal renunciation of tribal rights and privileges, whatever she was entitled to. This was her condition when the treaty of 1855 was entered into; she being then about nine years of age, as heretofore stated. This treaty accorded to every tribal Indian of the three confederated tribes and bands of Walla Wallas, Cayuses, and Umatillas a community of interest in the right to exclusive occupancy of the lands of the Umatilla reservation, which community of interest entitled each to share in the ultimate allotment of such lands; it being the policy of the general government and the general purpose of the Indians that, if they so desired, the lands of the reservation, or so much thereof as might be necessary for that purpose, should eventually be allotted among them in severalty, that they might be established in permanent homes. This community of interest became and was a right of property not to be divested without the consent, express or implied, of the individual Indian. The language of the allotment act of 1885 pertaining to the Umatilla reservation is that the President shall "cause lands to be allotted to the confederated bands * * * residing upon the Umatilla reservation." But this act has been construed to include Indians of such bands not then residing upon the reservation. It was sufficient that the individuals seeking allotments were members of the confederated bands or tribes settled thereon, and recognized as such by their chiefs, although they may have resided elsewhere. Hy-yu-tse-mil-kin v. Smith, 194 U. S. 401, 24 Sup. Ct. 676, 48 L. Ed. 1039. Some language found in the opinion rendered in this case is taken to mean that no member of the confederated tribes, who was residing without the old limits, or the country ceded by the treaty to the general government, at the time of the passage of the allotment act of 1885, was entitled to an allotment. I think the construction is not warranted. The language alluded to was used with reference to the fact as it appeared in that case, namely, that the plaintiff resided within the old limits; but it does not follow that the decision would have been different if it had been made to appear that she resided without such limits at the time, instead of within. Indeed, it is obvious, from the general doctrine of the opinion, that the result would have been the same.

Philomme has never, so far as the record shows, expressly assented to the divestment of her community of interest, and we may inquire whether she has by implication. If she has, it is because she has long lived off the reservation, has adopted the manners of civilization, and

has married a white person. What she has done, with the exception of the manner of her marriage, conforms with the manifest purpose both of the treaty and of the act providing for allotment. I quote the language employed by Mr. Justice Peckham in his opinion rendered in Hy-yu-tse-mil-kin v. Smith, supra:

"The purpose of the treaty and of the act evidently was to induce the Indians and encourage them so far as possible to break up the tribal relations and adopt the habits of an agricultural people, and it would seem that those persons who were Indians and members of one or the other bands or tribes of Indians mentioned in the treaty and in the act and recognized by the chief of the tribe, should have the right to an allotment, especially if recognized by the Land Department as entitled thereto."

The later general act of 1887 voices the purpose with much greater emphasis when it accords to every allottee, and to every Indian who has taken up his residence separate and apart from his tribe, and has adopted the habits of civilized life, the right of citizenship. So that in so far as Mrs. Smith's mode of living has tended towards a separation and a relinquishment of her tribal relations, and the adoption of a civilized life, it has been in harmony with the purposes of the treaty, and of the general government as voiced by legislation subsequently adopted, and could not be construed or held to be an implied renunciation of her community rights in and to the reservation lands. Nor could the mere fact of marriage to a white person operate as a renunciation of such community rights. But notwithstanding the marriage of Philomme to Smith, and her long residence outside of the limits of the reservation, she was acknowledged by the chiefs of the confederated tribes to be a member of the Walla Walla tribe. From the testimony adduced herein, read in connection with that taken in the case of Hy-yu-tse-mil-kin v. Smith, supra, it appears that Mrs. Smith was advised by Homily and Show-a-way, chiefs, respectively, of the Walla Walla and Cayuse tribes, to come upon the reservation and make selections for allotments to herself and children, and that thereafter she was recognized by both these chiefs, and by Peo, the chief of the Umatillas, as being a member of the Walla Walla tribe. It is true that she was not so recognized at first, but she was finally, and by a general council of the Indians held for the especial purpose of determining the matter. This feature attending the cause I deem to be important, as it shows that Mrs. Smith was entitled to a community interest in the reservation lands at the time the treaty was entered into, and, having not renounced that right in the meanwhile, she would be entitled to an allotment. Beyond this, it has been determined that she was so entitled by the Secretary of the Interior, and allotments were in fact made to both herself and children. This as it pertains to Mrs. Smith.

Have her children the right to allotments? The treaty of 1855 provides for the setting apart of designated tracts of the reservation to families for permanent homes. Act March 3, 1885, c. 319, 23 Stat. 340, however, provides for an allotment to each head of a family, each single person over the age of 18 years, each orphan child under the age of 18 years, and each child under 18 years of age not otherwise provided for. This latter classification includes the children of the heads of families. Mrs. Smith, being married to a white person, was her-

self the head of a family. Hy-yu-tse-mil-kin, v. Smith, supra. So it would seem to follow quite naturally that her children were entitled to allotments along with herself. The rule sustained by the weight of authority is that the status of half-breed Indians, the offspring of an Indian woman married to a white person, follows the condition of the father. To this there is an exception which obtains where the mother remains with her tribe, retaining the nurture of the children, when abandoned by the husband and father. In such case the children become of tribal affiliation with the mother. 22 Cyc. 112; United States v. Hadley (C. C.) 99 Fed. 437; United States v. Higgins (C. C.) 103 Fed. 348; Farrell v. United States, 110 Fed. 942, 49 C. C. A. 183.

Treaty stipulations with the Indians, however, are deemed to apply to half-breeds as well as full-bloods, unless otherwise specially provided in the treaty. Sioux Mixed-Bloods, Attorney General, 20 Opinions of Attorneys General, 742, 743; Pennock v. Commissioners, 103 U. S. 44, 46, 26 L. Ed. 367.

Congress has, by the general Indian appropriation act of June 7, 1897, c. 3, 30 Stat. 90, put its own interpretation upon the allotment acts, wherein it declares:

"That all children born of a marriage heretofore solemnized between a white man and an Indian woman by blood and not by adoption, where said Indian woman is at this time, or was at the time of her death, recognized by the tribe shall have the same rights and privileges to the property of the tribe to which the mother belongs, or belonged at the time of her death, by blood, as any other member of the tribe, and no prior act of Congress shall be construed as to debar such child of such right."

It is without the authority of Congress to adopt legislation extending rights and privileges in subversion of others that have been exercised, where property interests have attached by reason thereof. Such, however, was manifestly not the purpose of this act of 1897, but rather to interpret the intendment of the previous acts according the right and privilege of allotments to Indians. So, therefore, as if to set at rest further controversy as to whether the rule or the exception above alluded to should govern, the Congress has spoken relative to the status of Indians not of full blood, where the mother is an Indian woman by blood, declaratory of its intendment in awarding allotments to Indians, and has made the exception the general rule in all such cases. In the present case, the mother has been recognized by her tribe, so that that condition of the statute is present to establish the right of her children to allotments.

The evidence as to Mrs. Smith's selections for herself and children and settlement upon the lands in question long prior to the allotments to Martha Hebert and Margaret Bourner is quite conclusive. She and her husband went upon the Umatilla reservation in the spring of 1888, and returned thereto in the fall; and during the year the selections were made, a house was built upon the premises here in question, and barns were constructed upon the quarter section of land selected by Mrs. Smith for herself; the whole was inclosed by a fence, and improvements to the amount of some $700 or $750 were made thereon by F. A. Smith and his wife for the latter and the children; and the premises were found in this condition, with these parties in

possession, at the time the allotment commissioners made the allotments to Hebert and Bourner. There is some testimony going to show that, some time prior to the allotment, Yum-sum-kin hauled posts upon the premises, and perhaps plowed furrows about them, included with a large parcel of other land. But beyond this there was no settlement, and there was no selection of any specific tract. It is quite well substantiated that neither Yum-sum-kin nor his sisters, for whom he says he was acting, were in possession of this land after the time that Philomme Smith and her husband went thereon with their family, or while they were making the improvements; nor were they in possession, nor any one succeeding them, at the time the allotments were actually made.

It has been adjudicated in Hy-yu-tse-mil-kin v. Smith, supra, that Philomme Smith was equitably entitled to the allotment awarded to Hy-yu-tse-mil-kin; and, while that case cannot operate as an estoppel in this, the parties not being the same, yet it is persuasive as indicative of what ought to be done here.

The only other point in the case made by counsel for the defendants is that F. A. Smith is not legally entitled to succeed to the interest of Lura, George, and Sophia Smith, all of whom died subsequent to the selection and settlement upon this land and the allotment thereof to Hebert and Bourner. But this question has been settled upon a demurrer to the bill of complaint; the opinion thereon having been rendered by Judge Bellinger, my predecessor. 132 Fed. 889. It is unnecessary, therefore, that I consider the question further.

These considerations lead to a decree as prayed for by the bill of complaint, and it will be so entered.