106 F.3d 130
 UNITED STATES of America, on Behalf of the SAGINAW CHIPPEWA
INDIAN TRIBE, Plaintiff-Appellant,
Saginaw Chippewa Indian Tribe of Michigan, Intervenor-Appellant,
v.
STATE OF MICHIGAN, et al., Defendants-Appellees.
 Nos. 95-1574, 95-1575.
 United States Court of Appeals,
Sixth Circuit.
 Argued and Submitted Oct. 17, 1996.
Decided Jan. 22, 1997.
Rehearing and Suggestion for Rehearing En Banc Denied March
31, 1997.
 
 Lauren N. Soll, Dept. of Justice, Indian Resources Section, Environmental and Natural Resources Div., Washington, DC, for U.S., in Nos. 95-1574, 95-1575.
 Tamara N. Rountree (argued and briefed), U.S. Dept. of Justice, Land & Natural Resources Div., Washington, DC, for U.S., in No. 95-1575.
 Michael G. Phelan, Pirtle, Morisset, Schlosser & Ayer, Mt. Pleasant, MI, Frank R. Jozwiak (briefed), K. Allison McGaw, Morisset, Schlosser, Ayer & Joziak, Seattle, WA, for Saginaw Chippewa Indian Tribe of Michigan, in No. 95-1574.
 Frank R. Jozwiak, Morisset, Schlosser, Ayer & Joziak, Seattle, WA, for Saginaw Chippewa Indian Tribe of Michigan, in No. 95-1575.
 James E. Riley, Stephen F. Schuesler, Office of the Attorney General, Natural Resources Div., Russell E. Prins, Office of the Attorney General of Michigan, Steven D. Hughey, Office of the Attorney General, Finance & Development Section, Lansing, MI, for State of Michigan, in Nos. 95-1574, 95-1575.
 Larry J. Burdick, Pros. Atty., Mark H. Duthie (argued and briefed), Isabella County Prosecutor's Office, Mt. Pleasant, MI, for County of Isabella, Isabella Tp., in Nos. 95-1574, 95-1575.
 Paul H. Chamberlain, Mt. Pleasant, MI, for Tp. of Union, Duane Sherwood, in Nos. 95-1574, 95-1575.
 Larry J. Burdick, Pros. Atty., Isabella County Prosecutor's Office, Mt. Pleasant, MI, for Steven Pickens, Denver Tp., Chippewa Tp., in No. 95-1574.
 Michael G. Phelan, Pirtle, Morisset, Schlosser & Ayer, Mt. Pleasant, MI, Larry J. Burdick, Pros. Atty., Isabella County Prosecutor's Office, Mt. Pleasant, MI, K. Allison McGaw, Morisset, Schlosser, Ayer & Joziak, Seattle, WA, for Chippewa Tp., in No. 95-1575.
 Sue A. Jeffers, Lynch, Gallagher, Lynch, Shirley & Martineau, Mt. Pleasant, MI, for City of Mt. Pleasant, in Nos. 95-1574, 95-1575.
 R. John Wernet, Jr., Asst. Atty. Gen. (argued and briefed), Office of the Attorney General, State Affairs Div., Lansing, MI, for John M. Engler, Douglas B. Roberts, Thomas M. Hoatlin, in Nos. 95-1574, 95-1575.
 Before: MERRITT, JONES, and COLE, Circuit Judges.
 MERRITT, Circuit Judge.
 
 
 1
 The Department of Justice brought this action on behalf of an Indian Tribe and individual Indian property owners against the State of Michigan and various political subdivisions of Michigan that have assessed ad valorem property taxes on Indian-owned lands. The case raises the question of whether certain parcels of land in Michigan west of Saginaw Bay that are owned by the Saginaw Chippewa Indian Tribe and by members of the Tribe are subject to ad valorem property taxes. The Supreme Court has clearly stated the rule in such cases as follows: " '[A]bsent cession of jurisdiction or other federal statutes permitting it,' ... a State is without power to tax reservation lands and reservation Indians." County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation, 502 U.S. 251, 258, 112 S.Ct. 683, 688, 116 L.Ed.2d 687 (1992) (quoting Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973)). Congress is not deemed to have authorized state taxation unless it has "made its intention to do so unmistakably clear." Yakima at 258, 112 S.Ct. at 688 (quoting Montana v. Blackfeet Tribe, 471 U.S. 759, 765, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753 (1985)). Thus we must determine whether Congress has expressed an "unmistakably clear" intention to authorize state taxation of the land at issue. We find that Congress has not shown such an "unmistakably clear" intent. Therefore we REVERSE the district court's grant of summary judgment to Michigan and the county and township defendants. We REMAND the case, however, for resolution of the defendants' claims that the land at issue is not reservation land and that the Saginaw Chippewa Tribe has been dissolved. Those claims have not yet been adjudicated and we express no opinion on them.
 
 
 2
 * * *
 
 
 3
 By treaty dated August 2, 1855, the United States agreed to give to the Saginaw, Swan Creek, and Black River Chippewas certain land that was publicly-owned at that time--including the parcels of land at issue in this suit. The United States agreed to "patent" or "allot," i.e. convey, tracts of the land to individual Chippewa Indians. Treaty with the Chippewas, Aug. 2, 1855, art. 1, 11 Stat. 633. In 1864, the same parties signed a new treaty that contained new allotment provisions. Treaty with the Chippewa Indians, Oct. 18, 1864, 14 Stat. 657. The 1864 treaty also altered the lands set aside for the Chippewas. Under the 1855 treaty, the United States had agreed to withdraw from sale all unsold public lands within six townships in Isabella County and six townships adjacent to Saginaw Bay. In the 1864 treaty, the Chippewas conveyed the Saginaw Bay land back to the United States in exchange for the United States' agreement to set apart the unsold lands in the six townships in Isabella County "for the exclusive use, ownership, and occupancy" of the Chippewas. Id.
 
 
 4
 The United States conveyed each of the parcels of land at issue in this case to individual Chippewa Indian owners under the terms of the 1864 treaty. Each of the parcels then went through a chain of owners that included at least one non-Indian owner. Each parcel, however, was subsequently purchased by either the Saginaw Chippewa Indian Tribe or by a member of the Tribe. After the Tribe and the individual Indian owners had purchased the parcels, the county and township defendants continued to assess ad valorem property taxes on the parcels, as they had during the periods of non-Indian ownership.
 
 
 5
 The United States and the Tribe seek declaratory and injunctive relief as well as reimbursement of property taxes that the Tribe paid. They claim that the defendants lack jurisdiction to assess ad valorem property taxes on the land at issue because the land is owned by Indians within Indian Country. The district court granted summary judgment for the defendants, finding that when Congress conveyed the land to individual Indian owners in unrestricted fee simple pursuant to the 1864 treaty, Congress intended to give the state the authority to tax the land.
 
 
 6
 We are faced solely with the legal question of whether Michigan and its political subdivisions have the power to assess ad valorem property taxes on the property at issue. Neither the 1864 treaty nor the 1855 treaty mentions taxation explicitly. Under both treaties, however, land that the United States conveyed to individual Indian owners became alienable without any restrictions. The defendants follow the familiar model of contemporary legal argument by taking out of context a snippet of language from a Supreme Court opinion and manipulating it to reach a chosen result. They seize on language from County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation, 502 U.S. 251, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992), and erroneously argue that the free alienability of this land in the hands of these Indians in and of itself makes the land subject to state property taxation.
 
 
 7
 The defendants base their interpretation of Yakima primarily on the Court's statement, made during its discussion of an earlier case, that "when § 5 [of the Indian General Allotment Act of 1887] rendered the allotted lands alienable and encumberable, it also rendered them subject to assessment and forced sale for taxes." Yakima at 263-64, 112 S.Ct. at 691. When read out of context, this statement seems to support the defendants' claim that any congressional act making Indian land alienable is sufficient to show a clear intention to make the land subject to property taxes. Within the context of the Yakima opinion, however, this statement was merely part of an explanation of "the structure of the General Allotment Act," id. at 262, 263, 112 S.Ct. at 690.
 
 
 8
 The General Allotment Act of 1887, the legislation interpreted in Yakima, provided for conveyance of certain land to individual Indian owners. Under the Act, the United States was to hold each parcel in trust for twenty-five years, after which it was to convey the land in fee to its Indian owner. As originally enacted, the Act did not explicitly discuss whether or not the land conveyed would be subject to state property tax. In 1906, however, Congress enacted the Burke Act, which amended Section 6 of the General Allotment Act and made clear that land conveyed in fee under the Act would be subject to ad valorem taxation. The Burke Act provided that after such a conveyance "all restrictions as to sale, incumbrance, or taxation of said land shall be removed." 25 U.S.C. § 349 (emphasis added).
 
 
 9
 Section 6, now codified as 25 U.S.C. § 349, reads as follows (the Burke Act having added the provisos):
 
 
 10
 At the expiration of the trust period and when the lands have been conveyed to the Indians by patent in fee, as provided in section 348 of this title, then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside; and no Territory shall pass or enforce any law denying any such Indian within its jurisdiction the equal protection of the law: Provided, That the Secretary of the Interior may, in his discretion, and he is authorized, whenever he shall be satisfied that any Indian allottee is competent and capable of managing his or her affairs at any time to cause to be issued to such allottee a patent in fee simple, and thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed and said land shall not be liable to the satisfaction of any debt contracted prior to the issuing of such patent: Provided further, That until the issuance of fee-simple patents all allottees to whom trust patents shall be issued shall be subject to the exclusive jurisdiction of the United States: And provided further, That the provisions of this Act shall not extend to any Indians in the former Indian Territory.
 
 
 11
 (second emphasis added). The defendants' argument that the Yakima Court could not have relied on this section's explicit taxation language because that language applies only to lands conveyed to "competent" Indians prior to the expiration of the trust period is error. The Yakima Court relied on this explicit taxation language throughout its opinion, including the portion of the opinion dealing with excise taxes (discussed below), without differentiating between lands conveyed early to "competent" Indians and lands conveyed after the trust period expired. The Court thus implicitly read the word "thereafter" to apply to both the "expiration of the trust period" and the issuance of a fee simple patent to a "competent" Indian. Indeed, this is the only reasonable interpretation of the statute. As a policy matter, it makes no sense to treat the two types of land differently for purposes of taxability--especially more than one hundred years after the initial conveyances were made.
 
 
 12
 Michigan argues that alienability necessarily implies taxability as a general proposition, instead of recognizing that the language of the proviso quoted above in the General Allotment Act Congress expressly tied the two together only for purposes of the Indian lands covered in that Act. In Yakima, the Supreme Court held that "by specifically mentioning immunity from land taxation as one of the restrictions that would be removed upon conveyance in fee, Congress in the Burke Act proviso manifested a clear intention to permit the state to tax such Indian lands." Yakima, 502 U.S. at 259, 112 S.Ct. at 688 (internal quotation marks omitted). Thus, the Yakima decision, properly interpreted, does not alter the general rule requiring an "unmistakably clear" expression by Congress to allow state taxation of Indian land. Congress has taken no such action with respect to the Indian lands in the instant case.
 
 
 13
 The Yakima opinion demonstrates that a treaty provision that makes Indian land fully alienable does not, by itself, rise to the level of "unmistakably clear" congressional intent to give states the authority to tax such alienable Indian lands. Alienability does not alone imply taxability. In addition to holding that lands conveyed under the General Allotment Act are subject to state ad valorem property taxes only because of the explicit language of the Burke Amendment, the Yakima Court held that the Act does not authorize state excise taxes on the sale of such land. The implication that land becomes subject to excise sales taxes follows just as strongly from congressional action making the land alienable as the implication that the land becomes subject to ad valorem property taxes. Rather than relying on this implication, however, the Court barred excise taxation of land transfers, concluding that "[t]he short of the matter is that the General Allotment Act explicitly authorizes only 'taxation of ... land,' not 'taxation with respect to land,' 'taxation of transactions involving land,' or 'taxation based on the value of land.' " Id. at 269, 112 S.Ct. at 694.
 
 
 14
 The defendants argue that in Goudy v. Meath, 203 U.S. 146, 27 S.Ct. 48, 51 L.Ed. 130 (1906), when faced with a treaty similar to the one in this case that did not explicitly permit taxation, the Supreme Court appears to have held that alienability is tantamount to taxability. As the Ninth Circuit has recognized, however, "[t]his proposition may be hard to square with the requirement, recently approved by the Yakima Nation Court, that Congress' intent to authorize state taxation of Indians must be unmistakably clear." Lummi Indian Tribe v. Whatcom County, Washington, 5 F.3d 1355, 1358 (9th Cir.1993). We believe that this doubt by the Lummi court is superior to its ultimate holding that alienability implies taxability. The Yakima Court chose not to follow Goudy 's holding with respect to the taxability of treaty lands. The Ninth Circuit improperly relied on the 1906 Goudy decision, instead of following Yakima.
 
 
 15
 The Lummi court's holding that alienability implies taxability would have much to commend it, and we would subscribe to it, if we were writing on a clean slate. It is not very satisfying as a policy matter to treat lands that were initially conveyed over 100 years ago differently for tax purposes depending on whether they were conveyed under the General Allotment Act or some other treaty. In Yakima, however, the Supreme Court reaffirmed and instructed us that such policy decisions are not for the courts to make. Rather than finding that alienable Indian lands are subject to excise taxes on the general policy grounds that the defendants advocate, the Court carefully parsed the language of the General Allotment Act to determine whether or not Congress expressed an unmistakably clear intention to subject the land to such taxes. We must follow this example even though it leads to an unsatisfactory result in terms of wise policy.
 
 
 16
 The defendants' reliance on Pennock v. Commissioners, 103 U.S. 44, 26 L.Ed. 367 (1880) is also misplaced. In Pennock, the Supreme Court held that the state of Kansas had authority to tax land that had been conveyed to an Indian in fee simple. The plaintiff in Pennock, however, had remained behind in Kansas when her tribe and its reservation lands moved to a different state. Pennock stands only for the proposition that states have the authority to tax an Indian's lands that are not located within Indian Country. See id. at 48 ("[The plaintiff's] subsequent relation to her tribe, as a member of it ... cannot affect the jurisdiction of the State over her property for governmental purposes. She might have followed her tribe ... but as that tribe ... has left the State, while she remains, and has taken ... a title carrying with it absolute ownership, with a right of free disposition at her will, she and her property have come under the control of the State....").
 
 
 17
 Congressional action making Indian land alienable does not, by itself, show an "unmistakably clear" intention to authorize states to tax the land. Unlike the General Allotment Act, the treaties in this case do not demonstrate such congressional intent. Nor have the defendants presented any other evidence showing such an intent. Therefore, Congress has not made the land at issue subject to state property taxes, and the defendants lack authority to impose such taxes.
 
 
 18
 The defendants also argue that even if the treaty of 1864 did not authorize state property taxes, the provisions of the General Allotment Act, particularly Section 6, apply to land conveyed under prior treaties and authorize the taxes at issue. The defendants rely exclusively on two passages from Section 1 of the General Allotment Act:
 
 
 19
 in all cases where any tribe or band of Indians has been, or shall hereafter be, located upon any reservation created for their use, either by treaty stipulation or by virtue of an act of Congress or executive order setting apart the same for their use, the President of the United States be, and he hereby is, authorized, whenever in his opinion any reservation or any part thereof is advantageous for agricultural and grazing purposes, to ... allot the lands in said reservation....
 
 
 20
 ....
 
 
 21
 Provided ... That where the treaty or act of Congress setting apart such reservation provides for the allotment of lands in severalty in quantities in excess of those herein provided, the President, in making allotments upon such reservation, shall allot the lands to each individual Indian belonging thereon in quantity as specified in such treaty or act....
 
 
 22
 24 Stat. 388; codified with amendments at 25 U.S.C. § 331.
 
 
 23
 The defendants claim that the first of these passages "makes it clear that the General Allotment Act was to apply generally to all reservations, whether created by treaty, by statute, or by executive order." This claim is undeniably true, but it does not follow that the substantive provisions of the Act were intended to apply to all grants of land under any treaty. Rather, the General Allotment Act provides an additional mechanism by which the President can allocate reservation lands to individual Indians. This allocation is limited to lands that are "advantageous for agricultural and grazing purposes." Until the President exercises the authority delegated in the Act, Section 6 allowing ad valorem taxation is not triggered. Nothing in either the language cited by the defendants or the remainder of the Act suggests that Congress intended either to bar allocations pursuant to pre-existing treaties or to alter the substantive rights of Indian owners of property that was allocated before Congress enacted the General Allotment Act. See United States v. Kopp, 110 F. 160, 165-66 (D.Wash.1901) (rejecting claim that Indian who received land pursuant to an 1854 treaty was subject to the trust provisions of the General Allotment Act).
 
 
 24
 The second passage that the defendants cite is equally unavailing. The defendants claim that the passage "clearly demonstrates the intent of Congress that the substantive provisions of the Act ... would apply to allotments made by treaty as well as those made by statute, except in one circumstance" as specified in the statute. The quoted proviso, however, serves only to define the scope of the President's power to allot lands under the Act. Nothing in that passage indicates that the General Allotment Act provisions govern land grants that are not made pursuant to the Act or that were made before the Act was passed.
 
 
 25
 For the foregoing reasons, we REVERSE the district court's grant of summary judgment and REMAND for further proceedings, including adjudication of the defendants' claims that the land at issue is not reservation land and that the Saginaw Chippewa Tribe has been dissolved.