882 F.Supp. 659 (1995)
UNITED STATES of America, on Behalf of the SAGINAW CHIPPEWA TRIBE and its members, Plaintiff,
Saginaw Chippewa Indian Tribe of Michigan, on its own behalf and as parens patriae for its members, Plaintiff-Intervenor,
v.
STATE OF MICHIGAN, County of Isabella, City of Mount Pleasant, Union Township, Isabella Township, Denver Township, Chippewa Township, Steven Pickens, and Duane Sherwood, Defendants.
No. 91-CV-10103-BC.
United States District Court, E.D. Michigan, Northern Division.
March 23, 1995.
*660 *661 Michael J. Hluchaniuk, Asst. U.S. Atty., Bay City, MI, Lauren Soll, Dept. of Justice, Environmental & Natural Resources Div., Indian Resources Sec., Washington, DC, for plaintiff.
Frank R. Jozwiak, Seattle, WA, Michael Phelan, Saginaw Chippewa Indian Tribe, Mount Pleasant, MI, for plaintiff-intervenor.
R. John Wernot, Jr., Ross Bishop, Asst. Attys. Gen., State Affairs Div., Lansing, MI, for State of Mich.
Larry J. Burdick, Mark H. Duthie, Office of the Pros. Atty., Mt. Pleasant, MI, for County of Isabella, Isabella Tp., Denver Tp., Chippewa Tp., Steven Pickens.
Sue A. Jeffers, William J. Shirley, Mt. Pleasant, MI, for City of Mt. Pleasant.
Paul H. Chamberlain, Mt. Pleasant, MI, for Union Tp., Duane Sherwood.

MEMORANDUM OPINION AND ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS
CLELAND, District Judge.

I. Background
This matter is before the court on cross motions for summary judgment.[1] This controversy arises from the levying of ad valorem property taxes by the defendants upon lands owned by individual members of the plaintiff Tribe or collectively by the Tribe itself.[2] On February 10, 1988, the plaintiffs paid $1,449.37 to satisfy 1987 ad valorem taxes levied by Isabella County and Union Township. Since 1988, plaintiffs have refused to pay any further ad valorem taxes and initiated this suit in 1991 for reimbursement of the $1,449.37 and to enjoin defendants from further levy of ad valorem taxes.
This case has a complex procedural history, only the highlights of which require exposition. Oral argument has twice been held in this matter: first, with regard to the issue of reservation status (i.e., whether a reservation was created and whether, if created, it was diminished) and tribal status (i.e., whether the tribe was dissolved pursuant to the treaty *662 of 1864), and second, with regard to the propriety of levying ad valorem property taxes.
Prior to the second oral argument, the court ordered briefing by the parties on the ultimate issue of the propriety of imposing ad valorem taxes upon the instant property. In the order, the court noted that "[n]early all the parties agree[3] that the land specifically at issue here originates from that portion of land patented to James Gruette in 1871 pursuant to the treaties of 1855 and 1864, granting to him an unrestricted fee simple absolute estate in land. See, Pl. First Am. Complaint, p. 3, ¶ 7; Def. State of Michigan Answer, p. 6, ¶ 7; Def. Township Answer, p. 3, ¶ 7; Def. County of Isabella Answer, p. 3, ¶ 7."
At the second oral argument, held November 8, 1994, the court inquired of each party and was assured of the agreement of the parties that all land involved in this case is unrestricted fee simple land patented pursuant to the treaties of 1855 and 1864.[4]
The relevant treaties reflect the tenor of the times, and called for assimilation of Indians. One step toward this goal was to allot parcels of land to individual Indians. Thus, the treaty of 1855 provided for specific grants of land to various classes of Indians [i.e. head of family, single persons, etc.].
And the said Chippewas of Saginaw and of Swan Creek and Black River, shall have the same exclusive right to enter lands within the tracts withdrawn from sale for them for five years after the time limited for selecting the lands to which they are individually entitled, [and the same right to sell and dispose of land entered by them, under the provisions of the Act of Congress known as the Graduation Act], as is extended to the Ottawas and Chippewas by the terms of said agreement.
Article 1, treaty of 1855 (emphasis supplied) (amended portion in []s).
After describing the particular consideration for the agreement, the treaty states:
The tribal organization of said Indians, except so far as may be necessary for the purpose of carrying into effect the provisions of this agreement, is hereby dissolved.
Article 6, treaty of 1855 (emphasis supplied).[5]
The treaty of 1864 then provided a further step toward assimilation by providing for an eventual end to the relationship between Indian allotted as beneficiary and United States as trustee (with the land as the res).
After selections are made, as herein provided, the persons entitled to the land may take immediate possession thereof, and the United States will thenceforth and until the issuing of patents as hereinafter provided, hold the same in trust for such persons, and certificates shall be issued, in a suitable form, guaranteeing and securing to the holders their possession and an ultimate title to the land. But such certificates shall not be assignable and shall contain a clause expressly prohibiting the sale or transfer by the holder of the land described therein.
After the expiration of ten years, such restriction on the power of sale shall be withdrawn, and a patent shall be issued in the usual form to each original holder of a certificate for the land described therein PROVIDED That such restriction shall cease only upon the actual issuing of the patent; AND PROVIDED FURTHER That the President may in his discretion at any time in individual cases on the recommendation of the Indian agent when it shall appear prudent and for the welfare of any holder of a certificate, direct a patent to be issued (emphasis provided).
The scheme under the 1864 treaty required differential treatment of Indians depending on their perceived capabilities.

*663 So soon as practicable after ratification of this treaty, the agent for said Indians shall make out a list of all those persons who have heretofore made selections of lands under the treaty of August 2d, 1855, aforesaid, and of those who may be entitled to selections under the provisions of this treaty, and he shall divide the persons enumerated in said list into two classes, viz: `competent' and `those not so competent.'
Article 3, treaty of 1864.
* * * * * *
The United States agrees to issue patents to all persons entitled to selections under this treaty, as follows, viz: To those belonging to the class denominated `competents,' patents shall be issued in fee simple, but to those belonging to the class of `those not so competent,' the patent shall contain a provision that the land shall never be sold or alienated to any person or persons whomsoever, without the consent of the Secretary of the Interior for the time being.
Article 3, treaty of 1864 (emphasis supplied).
Although urged by plaintiffs and defendants alike to address the questions of reservation and tribal status, the court finds that to address these issues would be to create mere dicta. Since the issues of reservation and tribal status do not affect the propriety of the ad valorem property taxes levied here, the court declines to address them. This decision is a vexing one in light of the time and effort put forth by the parties in addressing these status issues which appeared more relevant prior to recent case law. The court appreciates this effort, but perceives a duty to refrain from analysis which exceeds necessity. Accordingly, the related issue of abstention with regard to the issue of tribal status is also beyond the reach of this opinion.[6]

II. Standard
Summary judgment is proper only where the moving party shows that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). There is no genuine issue of material fact when "the record as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The court is required to ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir.1989). The party opposing summary judgment must present "affirmative evidence in order to defeat a properly supported motion for summary judgment." Id. at 1479, citing Anderson v. Liberty Lobby, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

III. Discussion

A. Jurisdiction
The first issue raised by Defendant State of Michigan in its answer is whether jurisdiction is proper in this federal district court in light of 28 U.S.C. § 1341 which precludes the district court from enjoining, suspending or restraining tax levy or collection where a plain, speedy, and efficient remedy exists in the state courts.
Defendant's argument has been rejected by the United States Supreme Court where either the United States or the Tribe itself brings the action:
Here the United States could have made the same attack on the State's assertion of taxing power as was in fact made by the Tribe. We think that the legislative history of § 1362, though by no means dispositive, suggests that in certain respects tribes suing under this section were to be accorded treatment similar to that of the United States had it sued on their behalf. Since the United States is not barred by § 1341 from seeking to enjoin the enforcement of a state tax law, ... we hold that the Tribe is not barred from doing so here.
Moe v. Confederated Salish & Kootenai Tribes of the Flathead Reservation, 425 U.S. 463, 474-75, 96 S.Ct. 1634, 1641-42, 48 L.Ed.2d 96 (1976).
*664 Therefore, 28 U.S.C. § 1341 will not bar the instant cause of action and jurisdiction is proper in this federal district court.[7]

B. Merits
This is another case in which we must `reconcile the plenary power of the States over residents within their borders with the semi-autonomous status of Indians living on tribal reservations.'
Department of Taxation and Finance of New York v. Milhelm Attea & Bros., 512 U.S. ___, 114 S.Ct. 2028, 129 L.Ed.2d 52, 63 (1994). Particularly, the instant case requires the court to determine whether land located within reservation bounds and owned in fee simple absolute by individual Tribe members or the Tribe itself is immune from ad valorem property taxation.
Were the owners not Indians, and were the land not located within reservation bounds, the land would undoubtedly be subject to taxation because land owned in fee simple absolute (i.e. "unrestricted," "perfect title") is subject to taxation in the ordinary course. The answer to the question becomes complex only upon factoring in the identity of the owners of the land and the location of the land within reservation bounds. Plaintiffs urge the court to focus only upon the identity of the owners (tribe or tribal members) and the location of the land (within reservation bounds), whereas defendants ask the court to focus on the character of the title to the land (unrestricted fee). The court believes that the two viewpoints can be reconciled, with the status of land title being the more pertinent in determining the propriety of levying ad valorem property taxes upon unrestricted fee-patented land, as here.

1. In rem versus in personam jurisdiction
Identification of who owns the land and the effect of reservation boundaries are most relevant to in personam jurisdictional questions, while the quality of the land title is most relevant to in rem jurisdictional questions. Although plaintiffs would prefer that the court not recognize the distinction between in rem and in personam jurisdiction, the court must follow the United States Supreme Court's express differentiation between the two in County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation, 502 U.S. 251, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992).
In County of Yakima v. Confederated Tribes ("Yakima"), the Yakima Nation challenged the imposition of both ad valorem property taxes and excise taxes regarding unrestricted fee-patented land located within the bounds of the Yakima Reservation. After foreclosure proceedings were initiated in 1987, the Tribe commenced an action for declaratory and injunctive relief, contending that federal law prohibited both the ad valorem and excise (sales) taxation of these fee-patented lands owned by the Tribe. As more fully described below, the Court in Yakima held that state imposition of ad valorem property taxes was a proper exercise of the state's in rem jurisdiction over fee-patented lands within reservation bounds.

a. The Yakima precept
The Court in Yakima asserts that "in the area of state taxation, ... [a]bsent cession of jurisdiction or other federal statute permitting it," states are without power to tax "reservation lands and reservations [sic] Indians" absent "unmistakably clear" Congressional intent.[8]Yakima, 502 U.S. at 258, 112 S.Ct. at 688, citing Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973), Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 765, 105 S.Ct. 2399, 2402-03, 85 L.Ed.2d 753 (1985), and California v. Cabazon Band of Mission Indians, 480 U.S. 202, 215, n. 17, 107 S.Ct. 1083, 1091, n. 17, 94 L.Ed.2d 244 (1987).
*665 As noted earlier, the land involved in Yakima was unrestricted fee-patented land to which the Court applied the precept and determined that "clear Congressional intent" existed under the General Allotment Act. Application of the Yakima precept noted above to this case would therefore rest on the implicit postulate that the lands involved here are "reservation lands." Such, the instant court thinks, is not the case, as will be noted and discussed below at b(iii) and infra. In addition, there are two preliminary concerns about the Yakima precept that the court believes deserve review at the threshold. These are discussed at (i), the precept's foundation in precedent and, at (ii), whether it is dictum.

(i) Is the Yakima precept soundly based in precedent?
The Court in Mescalero formulated the basis for the presumption against taxability cited in Yakima and by other, later, Courts. The Court in Mescalero noted that "even on reservations state laws may be applied unless such application would interfere with reservation self-government or would impair a right granted or reserved by federal law." Mescalero, 411 U.S. at 148, 93 S.Ct. at 1270. However, the Court then continues:
[e]ven so, in the special area of taxation, absent cession of jurisdiction or other federal statues permitting it, there has been no satisfactory authority for taxing Indian reservation lands or Indian income from activities carried on within the boundaries of the reservation, and McClanahan v. Arizona State Tax Comm'n, supra, lays to rest any doubt in this respect by holding that such taxation is not permissible absent Congressional consent.

Mescalero, 411 U.S. at 148, 93 S.Ct. at 1270 (emphasis supplied).
However, in McClanahan, decided the same day as Mescalero and cited therein, the Court stated that "exemptions from tax should, as a general rule, be clearly expressed." McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 176, 93 S.Ct. 1257, 1264, 36 L.Ed.2d 129 (1973) (finding Arizona Enabling Act expressly provided exemption), citing Squire v. Capoeman, 351 U.S. 1, 6, 76 S.Ct. 611, 614-15, 100 L.Ed. 883 (1956) (stating that "exemptions to tax laws should be clearly expressed" and interpreting the treaty and Allotment Act as providing such clear expression of exemption).
Thus, the presumption in McClanahan and Squire appears to have favored the ability to tax in the absence of clearly expressed Congressional exemption, while Mescalero read McClanahan and Squire as precluding taxation absent specific Congressional consent.
The court further notes that these cases predate the express in rem and in personam jurisdiction distinction announced in Yakima and address what would now be considered in personam tax issues. Accordingly, their application to the ad valorem property tax issue in Yakima and the instant case seems to the court somewhat attenuated. This court's conclusion is that, upon inspection, the Yakima precept appears to have been a virtual inversion of precedent.

(ii) Is the Yakima precept obiter dictum?
In Mescalero, the Court decided the propriety of state taxation imposed on income derived from operation of a ski resort (gross receipts tax) and use tax imposed on the ski lifts themselves. The land upon which the ski resort was operated was not within reservation bounds but was owned by the federal government and leased to the Indians for thirty years through the Forest Service. Thus, the Court decided nothing about the propriety of taxes to be imposed on land within reservation bounds, nor on land which was owned by the federal government and held in trust for the benefit of the Indians, nor even land "set apart" for the use and enjoyment of the Indians.[9] Accordingly, the Court did not decide the propriety of taxation upon reservation Indians or reservation lands. Furthermore, as to the gross receipts tax imposed on the activities of Indians outside reservation bounds, the Court declined to imply an exemption "[a]bsent a `definitely *666 expressed' exemption." Mescalero, 411 U.S. at 156, 93 S.Ct. at 1274.
Obiter dictum is defined as "observations relevant, but not essential, to the determination of the legal questions then before the court." Dedham Water v. Cumberland Farms Dairy, 972 F.2d 453, 459 (1st Cir. 1992). Dictum "constitutes neither the law of the case nor the stuff of binding precedent." Id.
The precept derived  that taxation is not permissible absent Congressional consent  though it may be dictum, is oft-cited.[10] "Carefully considered statements of the Supreme Court, even if technically dictum, must be accorded great weight and should be treated as authoritative," especially when it is "`of recent vintage and not enfeebled by any subsequent statement.'" United States v. Santana, 6 F.3d 1, 9 (1st Cir.1993), quoting, McCoy v. Massachusetts Inst. of Technology, 950 F.2d 13, 19 (1st Cir.1991). The precept is a considered statement and has been quoted with approval since its genesis. Accordingly, although this court has analyzed its origins, it will nonetheless treat it as authoritative.
In McClanahan, the Court did address the issue of whether a reservation Indian's income derived from activities carried on within reservation bounds is tax exempt. As noted earlier, the Court in McClanahan stated the need for tax-exemptions to be clearly expressed, and found such express statutory income tax immunity in the Arizona Enabling Act. McClanahan, 411 U.S. at 176, 93 S.Ct. *667 at 1264.[11] Accordingly, the McClanahan holding was simply that the Arizona Enabling Act provided income tax immunity for all Indians residing on reservations.
Dictum in McClanahan, however, implies that the result would have been the same even absent Congressional tax-exemption. Although the Court in McClanahan cites Warren Trading Post Co. v. Arizona Tax Comm'n, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965), Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959) and Kennerly v. District Court, 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971), its dictum is an expansion if not an outright departure.
After the citation to Warren Trading Post the Court in McClanahan states that:
[t]he tax [in Warren Trading Post] in no way interfered with federal land or with the National Government's proprietary interests. But it was invalidated nonetheless because `from the very first days of our Government, the Federal Government had been permitting the Indians to largely govern themselves, free from state interference.'
McClanahan, 411 U.S. at 164, 93 S.Ct. at 1258, quoting Warren Trading Post.
However, the Court's decision in Warren Trading Post had rested upon the idea that state taxation of Indian traders indeed would interfere with the federal scheme:
These apparently all-inclusive regulations and the statutes authorizing them would seem in themselves sufficient to show that Congress has taken the business of Indian trading on reservations so fully in hand that no room remains for state laws imposing additional burdens upon traders.
Warren Trading Post, 380 U.S. at 690, 85 S.Ct. at 1245.
Such language presaged current recognition of areas which are subject to super-preemption by the federal government such as ERISA and LMRA. Holman v. Laulo-Rowe Agency, 994 F.2d 666, 668 (9th Cir. 1993).
Furthermore, the Court in Warren Trading Post noted that state taxation would "disturb and disarrange the statutory plan Congress set up in order to protect Indians." Warren Trading Post, 380 U.S. at 691, 85 S.Ct. at 1246. Accordingly, pre-emption was the primary motivator behind the Court's decision in Warren Trading Post; the case does not recognize Indian sovereignty within reservation bounds as an independent barrier to taxation, as the Court in McClanahan implies.
Similarly, Williams v. Lee held only that "Congress recognized this authority [to govern reservation affairs] ... If this power is to be taken away from them, it is for Congress to do it." Williams v. Lee, 358 U.S. at 223, 79 S.Ct. at 272. Although the case contains language favorable to Indian self-governance throughout the text, it is clear that the battle lines drawn are those of federal government versus state, not Indians versus state.[12]
Accordingly, had express Congressional exemption from taxation been absent in McClanahan, the result would not have been the same, contrary to the dictum in McClanahan. The convergence of dicta in Mescalero and McClanahan transforms reservation bounds into an independent jurisdictional barrier to state income taxation of Indians residing there, absent Congressional authority for such taxation. McClanahan, 411 U.S. *668 at 164, 93 S.Ct. at 1258 (where dictum indicated tax immunity for the activities conducted by Indians who reside within reservation bounds, even where the activity was not conducted within such bounds). This metamorphosis moves from dictum into the realm of binding precedent in Moe v. Confederated Salish & Kootenai Tribes of the Flathead Reservation, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976) (holding cigarette sales tax and personal property tax improperly imposed by state within reservation bounds).
The court thus concludes that, oddly enough, the fundamental language for the Yakima precept, created in Mescalero, appears to have been dictum. As noted earlier, however, it carries the authoritative weight of precedent and will be treated as such by this court. Santana, 6 F.3d at 9.[13]

(iii) Are reservation lands involved?
"Reservation lands" are those lands withheld from the public domain, i.e. land held in trust by the United States for the benefit of Indians. See, Potawatomi, supra, 498 U.S. 505, 111 S.Ct. 905 (equating "reservation" with "trust land"). Since the Yakima precept  that state taxation is precluded absent express Congressional authority  expressly limits its application to reservation lands, and since the lands herein are not reservation lands, it is inapposite here.
This conclusion is buttressed by the fact that the cases cited in Yakima and the cases cited within those cases, involved land held in trust by the United States for the benefit of the Indians. Mescalero, supra; McClanahan, supra; Squire, supra. Not one case, prior to Yakima, had applied the precept to unrestricted fee patented land within reservation bounds. Previous cases applying such a precept all involved restricted or trust land. E.g., Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 764, 105 S.Ct. 2399, 2402, 85 L.Ed.2d 753 (1985).
Accordingly, this court must express some degree of doubt about the correctness of applying a substantial precept such as the one in question. However, since the Court in Yakima began with it, so it shall be herein.

b. Application of the precept

i. Yakima
In applying the precept to land patented pursuant to the General Allotment Act, the Court in Yakima states:
Although such a fee patent [one after the Burke Act proviso enacted in 1906 which stated that § 6's grant of civil and criminal jurisdiction over Indian allottees would not be effective until the 25 year trust period expired under the General Allotment Act] would not subject its Indian owner to plenary state jurisdiction, fee ownership would free the land of `all restrictions as to sale, incumbrance or taxation.' 25 USC § 349. In other words, the proviso reaffirmed for such `prematurely' patented land what § 5 of the General Allotment Act implied with respect to patented land generally: subjection to state real estate taxes. And when Congress, in 1934, while putting an end to further allotment of reservation land, see 25 USC § 461, chose not to return allotted land to pre-General Allotment Act status, leaving it fully alienable by the allottees, their heirs and assigns, it chose not to terminate state taxation upon those lands as well.
Yakima, 502 U.S. at 264, 112 S.Ct. at 691 (internal citations omitted, emphasis in original).
Accordingly, the Court in Yakima upheld the state's imposition of ad valorem property taxes upon the fee-simple land owned by the tribe and tribal members.
The Court in Yakima was not persuaded by the argument that to permit the state to impose ad valorem property taxes upon unrestricted, fee-patented land would violate Moe's condemnation of checkerboard jurisdiction within reservation bounds:
"The Yakima Nation and the United States deplore what they consider the impracticable, Moe-condemned `checkerboard' effect produced by Yakima County's assertion of jurisdiction over reservation fee-patented *669 land. But because the jurisdiction is in rem rather than in personam, it is assuredly not Moe-condemned; and it is not impracticable either. The parcel-by-parcel determinations that the State's tax assessor is required to make on the reservation do not differ significantly from those he must make off the reservation ..."
Yakima, 502 U.S. at 264-65, 112 S.Ct. at 691.
Based on the distinction between in rem and in personam jurisdiction, the Court in Yakima also held that excise taxes on the sale of land could not be imposed. Id. The Court noted that excise taxes would intrude upon the self-governance of the tribe because they are imposed on the person, for the person's actions, i.e. they involve in personam jurisdiction.[14]
Plaintiff United States argues that Yakima did not address the question presented here because in Yakima, the Court
determined only that Congress had consented to state taxation of reservation lands patented under authority of the General Allotment Act (GAA), now codified at 25 U.S.C. § 331 et seq. The tax status of lands patented pursuant to other authorities, such as treaties at issue here, was specifically remanded by the Court.
Pl. U.S. Br., pp. 2-3. The plaintiff United States then concludes that since Yakima is not on all fours, "the per se rule against state taxation of reservation Indians announced in California v. Cabazon Band of [Mission] Indians, 480 U.S. 202, 215, n. 17 [107 S.Ct. 1083, 1091, n. 17, 94 L.Ed.2d 244] (1987), bars defendants' assertion of taxing jurisdiction over lands owned in fee by the Tribe and its members on the Isabella reservation." Pl. U.S. Br., p. 3; pp. 5-6.
First, the per se rule announced in California v. Cabazon was limited to "the special area of state taxation of Indian tribes and tribal members." California v. Cabazon, 480 U.S. at 215, n. 17, 107 S.Ct. at 1091, n. 17 (holding that the state could not tax gambling activities  involving in personam jurisdiction  conducted on the reservation). The "per se" rule precluding state jurisdiction was not even touted as applying to land owned by tribes. Since ad valorem property taxes are not taxes imposed upon Indians, but rather are imposed upon the land itself, the so-called per se rule would not apply under its own definition. California v. Cabazon, 480 U.S. at 214-215, 107 S.Ct. at 1091.[15]
As noted by the Court in Yakima, "[w]hile in personam jurisdiction over reservation Indians at issue in Moe would have been significantly disruptive of tribal self-government, the mere power to assess and collect a tax on certain real estate is not." Yakima, 502 U.S. at 265, 112 S.Ct. at 692. Thus, not only does the letter of the per se rule remain unscathed by ad valorem taxes levied upon the property of tribes, so does the spirit.
More importantly, a subsequent case, Lummi Indian Tribe v. Whatcom County, 5 F.3d 1355, 1357-59 (9th Cir.1993), is on all fours because it addresses lands patented, not pursuant to the GAA, but rather patented under a treaty similar to the instant treaties of 1855 and 1864.

ii. Lummi
In Lummi, supra, the Ninth Circuit interpreted Yakima and concluded that if the "land is alienable, it is taxable." In Lummi, *670 as here, the land was patented not under the General Allotment Act, but under a treaty. Id. The Ninth Circuit found this distinction to be of no import. Id.
The court notes initially that equating alienability with taxability in general is not an aberration from precedent. See, Given v. Wright, 117 U.S. 648, 652, 6 S.Ct. 907, 909-10, 29 L.Ed. 1021 (1886) (when "the land was sold to other parties in fee simple absolute, the abnormal qualities of the Indian tenure were extinguished, and all the conditions which rendered exemption from taxes requisite and proper ceased to exist."); Auditor General v. Williams, 94 Mich. 180, 184, 53 N.W. 1097 (1892) (stating that where the United States has relinquished control over property patented to Indians under the treaties of 1855 and 1864 via lifting all restrictions, "there can be no doubt of the right of the States to impose taxes upon it.").
Plaintiff United States argues that to equate alienability with taxability "would have brought into question a long line of Supreme Court cases, going back at least to McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), and would have implicitly overruled a number of decisions prohibiting state taxation of Indians' property." Pl. U.S. Reply Br., p. 3. However, neither McClanahan nor its progeny addressed land owned by Indians in fee simple absolute; thus, the cases plaintiff fears would be overruled in truth would not be affected because on their facts they are vastly distinguishable. McClanahan, Cotton Petroleum, Montana v. Blackfeet, etc. all involved restricted trust land, owned by the United States and held in trust for the benefit of the Indians.[16] They are not affected by the decisions in Yakima and in Lummi.
Plaintiffs also argue that the holding in Lummi is an improper expansion on the holding in Yakima and thus, should not be followed. Plaintiffs cite Southern Ute Indian Tribe v. Board of County Comm'rs, 855 F.Supp. 1194 (D.Colo.1994), in support of this argument.

iii. Defining the holding in Yakima  Southern Ute
The plaintiffs and the court in Southern Ute contend that the Yakima Court rested its decision on the General Allotment Act's "unmistakably clear" expression of Congressional intent to allow taxation of the patented land and thus, would not countenance the general rule stated in Lummi that "if land is alienable, then it is taxable."
The court in Southern Ute states that:
Alienability in Yakima and in Goudy [v. Meath, 203 U.S. 146, 27 S.Ct. 48, 51 L.Ed. 130] (1906) was important only as an indicator of congressional intent to permit taxation in that the Court thought it illogical the Congress would have intended to permit conveyance of land yet hold it immune from taxation. It was not an independent justification for taxation.
Southern Ute, 855 F.Supp. at 1200.
The same argument could be made here: alienability is important in indicating the intent of the parties to the treaty. "[I]t [is] illogical [that] the [parties to the treaty] would have intended to permit conveyance of the land yet hold it immune from taxation." Southern Ute, supra. Furthermore, the insertion of a step whereby Congressional intent is gleaned from alienability, merely adds another layer of implication between alienability and taxability. The court is unable to see how such additional implication renders the result more reliable.
The court in Southern Ute and the instant plaintiffs urge that where express statutory authority is lacking (i.e. where there is an absence of the words equating alienability with subjection to state property tax),[17] there can be no implication of an intent to allow *671 taxation of fee-patented lands.[18] Hence, plaintiffs and the court in Southern Ute conclude that the Ninth Circuit reads Yakima too broadly in concluding that "if alienable, then taxable."[19]
Even assuming the plaintiffs and the court in Southern Ute do not engage in implication, they have created a framework by which their own argument is lost. They argue that there was no implication of intent in Yakima; thus, the Ninth Circuit's reading is too broad. However, the Court in Yakima did imply intent; thus, their own reading is too narrow.
The General Allotment Act provided:
At the expiration of the trust period and when the lands have been conveyed to the Indians by patent in fee ... then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the State of Territory in which they may reside ... Provided, That the Secretary of the Interior may, in his discretion, and he is authorized, whenever he shall be satisfied that any Indian allottee is competent and capable of managing his or her own affairs at any time to cause to be issued to such allottee a patent in fee simple, and thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed.
25 U.S.C. § 349 (§ 6), cited in Yakima, 502 U.S. at 258, n. 1, 112 S.Ct. at 688, n. 1.
Thus, the only type of patented land that was expressly subject to taxation was that land which was "prematurely" patented by the Secretary before the conclusion of the trust period. However, the Court in Yakima did not limit its holding to those lands prematurely patented.
The Court in Yakima noted that the Burke Act proviso (1906) was enacted to "change the outcome of our decision in [In] Re Heff, [197 U.S. 488, 25 S.Ct. 506, 49 L.Ed. 848] so that § 6's [25 U.S.C. § 349] general grant of civil and criminal jurisdiction over Indian allottees would not be effective until the 25-year trust period expired and patents were issued in fee." Yakima, 502 U.S. at 264, 112 S.Ct. at 691 (internal citations omitted). The Court went on to note that the prematurely patented land would not subject the Indian patentee to plenary state jurisdiction but would only subject the land to freedom from "restrictions as to sale, incumbrance, or taxation." Yakima, 502 U.S. at 264, 112 S.Ct. at 691; citing 25 U.S.C. § 349 (§ 6).
The Court then concluded that "the proviso [Burke Act proviso, § 6] reaffirmed for such `prematurely' patented land what § 5 of the General Allotment Act implied with respect to patented land generally: subjection to state real estate taxes." Yakima, 502 U.S. at 264, 112 S.Ct. at 691 (emphasis supplied). Because it was stated in terms of "reaffirming" an implication, such implication was certainly recognized by the Court as existing before it could be "reaffirmed."
This finding of implied intent to expose all fee patented land to taxation led the Court to conclude that "it is inconsequential that the trial record does not reflect `which (if any) of the parcels owned in fee by the Yakima Nation or individual members originally passed into fee status pursuant to the proviso, rather than at the expiration of the trust period.'" Yakima, 502 U.S. at 264, n. 4, 112 S.Ct. at 691, n. 4. In other words, it did not matter whether the patents were "premature" (which were to be expressly subjected to taxation) or not; the result was the same: the fee-patented alienable land would be taxable.
If the Court in Yakima had desired a narrow holding which would preclude taxation of land patented pursuant to an act of Congress which did not explicitly mention taxability, then it would have distinguished between those premature patents (whose subjection to taxation was explicit) and land patented at the conclusion of the 25-year *672 trust period (whose subjection to taxation was not expressly stated and thus, could only be implied). See, Blackmun, J., dissenting, 502 U.S. at 271, 112 S.Ct. at 694-95 (dissenting in part because there was no "unmistakably clear" Congressional intent with regard to the lands which were not prematurely patented); see also, Lummi, 5 F.3d at 1357 ("The Court [in Yakima] made no distinction between fee land allotted by treaty and that allotted under the Act. Its interpretation of Section 5 of the Act and the proviso to section 6 imply that no matter how the land became patented, it is taxable once restraints on alienation expire.").
Thus, it seems that the majority's holding in Yakima was not as narrow as the plaintiffs and the court in Southern Ute contend that it was.[20] Accordingly, their argument is not persuasive reasoning to depart from Lummi.

iv. whether in rem jurisdiction is a fiction
Plaintiff Tribe contended, during oral argument, that because the legal incidence of the taxes fall upon the Indians, in rem jurisdiction is a fiction. The plaintiff Tribe adds that "the fiction of any in rem nature of the Michigan real property taxes at issue in this case is further highlighted by Michigan's own statutes. For example, under Michigan's amended general property Tax Act, real property is assessed to the owner, the assessment rolls must include the name and address of persons liable to the tax ..." Pl. Tribe Br., p. 7. First of all, plaintiff Tribe's argument is not supported by Michigan law. The applicable statute reads as follows:
Real property shall be assessed in the township or place where situated, to the owner if known, and also to the occupant, if any; if the owner be not known and there be an occupant, then to such occupant, and either or both shall be liable for the taxes on said property, and if there be no owner or occupant known, then as unknown.
Mich.Comp.Laws, § 211.3. Assessment to "the unknown" is an assessment on the property itself. See, Weber v. Enoch C. Roberts Iron Ore Co., 270 Mich. 38, 44, 258 N.W. 408 (1935) ("The tax levies were under procedure in rem and validity thereof was not affected by dissolution of the corporation."); Auditor General v. Williams, supra.
At oral argument, counsel on behalf of the Tribe also urged that Indians be held exempt from ad valorem property taxes because they do not reap the benefits of those taxes, e.g. public schools. However, if the validity of taxation depended on reciprocity or mutuality, all those retired octogenarians owning land in Florida would be exempt from property taxation because they do not send children to school and thus, do not reap the fruits of their property tax payments. Portions of like arguments may seem enticing but such is not the law. Instead, the "traditional notion [is] that taxation is not premised on a strict quid pro quo relationship between the taxpayer and the tax." Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 185, n. 15, 109 S.Ct. 1698, 1712, n. 15, 104 L.Ed.2d 209 (1989).

c. Other arguments
The plaintiffs offer a number of other arguments, beyond the analysis of the recent case law,[21] to support their position. These other arguments invoke sovereignty, sovereign immunity, or personal immunity/exemption of Indians and tribes. Consequently, analysis of these issues focuses on the persons who own the land, i.e., in personam jurisdiction. As noted earlier, the relevant inquiry here is in rem.
*673 Analysis of these other issues presented would not lead to a different result absent the Court's decision in Moe, supra, 425 U.S. at 478, 96 S.Ct. at 1643-44, which extended Seymour v. Superintendent of Washington State Penitentiary, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962) (criminal jurisdiction case) to civil jurisdiction issues. The Court in Moe held that the state was precluded from exercising taxing authority over activities (i.e., cigarette sales) within reservation bounds, even those occurring on lands owned in unrestricted fee simple. Moe, supra. The Court reasoned that such "checkerboard" jurisdiction would be as "impractical" as it would be in the criminal arena where "`enforcement officers operating in the area [would have to] search tract books in order to determine [] criminal jurisdiction ... even though committed within the reservation.'" Moe, 425 U.S. at 478, 96 S.Ct. at 1644, citing Seymour, 368 U.S. at 358, 82 S.Ct. at 428-29.
There is nothing in the statutory definition of Indian country,[22] or in the doctrine of Indian sovereignty[23] and the correlative *674 notion of immunity,[24] that would lead to a result different from that reached in Yakima and Lummi. All of these paths show Indian sovereignty as a dependent adjunct of the supremacy/pre-emption enjoyed by the United States against the individual states.
However, since the Court in Moe and Seymour rejected any definition that would create a pragmatic problem in defining jurisdiction, the Court in Yakima needed to recognize the in rem nature of ad valorem property tax jurisdiction to avoid Moe and Seymour's prohibition against checkerboarding in the personal jurisdiction arena.[25]

d. Nonintercourse Act
The United States also contends that the Non-Intercourse Act requires the plaintiffs be held immune from taxation. Pl. U.S.Br., pp. 16-19. The Act provides, in pertinent part:
No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or in equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.
25 U.S.C. § 177 (Non-Intercourse Act).
Since the Act, by its language, applies to land acquired from Indian tribes, not by Indian tribes, its relevance here is not readily apparent. Furthermore, the elements of a prima facie case for a violation of the Nonintercourse Act require, as element three, that "the United States has never approved or consented to the alienation of the tribal land." Catawba Indian Tribe v. South Carolina, 718 F.2d 1291, 1295 (4th Cir.1983) (emphasis supplied).[26] Here, the United States approved of alienation when it issued the unrestricted fee patent. Thus, element three could not be established, even if a claim under the Act were possible under these facts.
The Act is generally invoked by Indians to defeat title held by others where such title was acquired without consent of the United States. See, e.g., County of Oneida v. Oneida Indian Nation, 470 U.S. 226, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) (finding land bought by the state after the enactment of the Nonintercourse Act violated the Act where the purchase was made without the consent of the United States, thus giving Indians title to the land). Thus, in the ordinary course, the Act is cited in cases where ownership is at issue. In the instant case, all agree on who owns the land and thus no battle for title is waged.
The Act is relied upon by and its pertinence revealed by the United States. The *675 United States argues that "since tribal fee lands cannot be conveyed without federal approval, then the State and county cannot, by way of taxation, foreclosure and tax sale, effect an involuntary transfer of tribal land." Pl. U.S. Br., p. 19.
This argument begins with the premise that even unrestricted fee lands owned by the Tribe cannot be sold absent consent of the United States. Unrestricted fee title is, by definition, capable of being conveyed, i.e. alienable. Heretofore, the United States' argument has been that although it is alienable, it is not taxable. Now, however, the United States appears to contend that the Nonintercourse Act returns unrestricted fee land to trust status immediately when that unrestricted fee land is bought by an Indian or the Tribe.
The only authority offered by the United States in support of this premise is Alonzo v. United States, 249 F.2d 189 (10th Cir.1957), cert. denied, 355 U.S. 940, 78 S.Ct. 429, 2 L.Ed.2d 421 (1958). Upon close review, however, the Nonintercourse Act plays a small role in the decision of the Tenth Circuit. In Alonzo, the United States contended that title to lands held by the Pueblos was subject to restrictions against alienation even though said title was, on its face, that of unrestricted fee simple. The Tenth Circuit agreed that the land owned by the Pueblos was restricted fee land, finding support for its decision in the Nonintercourse Act, the New Mexico, Arizona Enabling Act, but, most importantly, on Sec. 17 of the Act of June 7, 1924, 43 Stat. 636, 641. The court in Alonzo stated:
But if we be wrong in our conclusion, which we do not concede, that the Enabling Act did not by implication remove restrictions with respect to lands acquired by the Pueblos by purchase, such restrictions were clearly reimposed by Sec. 17 of the Act of 1924, which clearly applies without qualification to all lands of the Pueblo Indians of New Mexico. The power of Congress to reimpose restrictions while the Pueblos were still wards of the Nation is not open to question.
Alonzo, 249 F.2d at 196. Thus, there was particularized statutory authority relating to Pueblos which reimposed restrictions upon land owned by them; the court did not rely on a broad reading of the Nonintercourse Act, as the United States would have this court do.
Although the result reached in Alonzo is attractive to the United States, the path of reasoning leading to the goal is a dark one which the United States would surely prefer not to reenter. The court in Alonzo stated that:
the reason for the imposition of restrictions is in no wise related to the manner in which the Indians reacquired their lands. The purpose of restrictions is to protect the Indians, `a simple, uninformed people, ill-prepared to cope with the intelligence and greed of other races' against the loss of their lands by improvident disposition or through overreaching by members others. There is as great a need for such protection of the Pueblos in New Mexico, with respect to their lands acquired by purchase, as there is to lands otherwise acquired.
Alonzo, 249 F.2d at 196. To hold that all land held by Indians to Tribes should be restricted, in order to protect the owners from their own mistakes, would be a regressive step toward regarding the relationship of the United States to Indians as that of "guardian to ward."[27] The court is not willing to take such a step backward, especially in the face of law to the contrary.[28]
*676 Furthermore, if all land held by Indian tribes were automatically restricted by operation of the Nonintercourse Act, then the Tribe would not have to submit to the cumbersome and lengthy process the United States referred to in oral argument and in its briefs whereby Tribes may petition the Department of the Interior to place lands owned by them into trust. See, 25 C.F.R. § 151.9 (1992).[29] If return to trust status were automatic via the Nonintercourse Act, a petitioning process to return land to trust status would be superfluous.
The Tribe also objects not only to the lengthy process but to its results. The Tribe argues that it is "no remedy to tell the Tribe it can avoid state taxation simply by not owning property." Tribe Reply Br., p. 5. In other words, the Tribe wants the tax exemptions that trust property enjoys (because owned by the United States), with all the freedom of outright ownership. This argument asks not for automatic trust status, but for automatic tax exemption upon re-purchase by Indians. An analogous argument was squarely rejected in the only similar case of which the court is aware: McCurdy v. United States, 246 U.S. 263, 38 S.Ct. 289, 62 L.Ed. 706 (1918).
In McCurdy, the land at issue had been part of a reservation, was sold and purchased by a non-Indian and thus, was subjected to ad valorem property taxes. McCurdy, 246 U.S. at 267, 38 S.Ct. at 290. The land was then purchased by a trustee (Brenner) for Robert and Emma Panther, out of Indian trust funds held on behalf of Robert Panther. Id. Soon thereafter, Brenner conveyed the land to Robert Panther individually. That deed provided that the land was inalienable and not subject to transfer, sale, or encumbrance for eighteen years (from July 1913) absent approval from the Secretary of the Interior. Id. The Court held that since Congress did not create the restriction (nor delegate the authority to the Secretary of the Interior), nor was title in the United States, the land was not exempt from taxation. McCurdy, 246 U.S. at 272, 38 S.Ct. at 292, contrasting United States v. Rickert, 188 U.S. 432, 23 S.Ct. 478, 47 L.Ed. 532 (1903) (finding tax exemption for land where title was in the United States held in trust for the benefit of the Indians). Consequently, Indian ownership is not sufficient to render land exempt from taxes.[30]

i. relationship between alienation and taxation
The argument by the United States under the Nonintercourse Act rests upon the interdependence of alienability with taxability. Unwittingly, the United States has conceded a major portion of its argument by contending that the Nonintercourse Act applies to restrict the land from alienation, and thus, protect the land from taxation.
The United States argues that "since tribal fee lands cannot be conveyed without federal approval, then the State and county cannot, by way of taxation, foreclosure and tax sale, effect an involuntary transfer of tribal land." Pl.U.S.Br., p. 19. This argument recognizes the link between alienation, taxation, and encumbrance. Encumbrance and taxation are *677 means of accomplishing alienation. Auditor General v. Williams, 94 Mich. at 189, 53 N.W. 1097 ("it [the United States] prohibits the alienation of the land conveyed to that class [of not so competents] in severalty; and having done so, it has a right to insist that such alienation shall not be brought about by the execution of state tax laws."). Thus, as the United States concedes, if land is subject to taxes, then it is subject to alienation. The converse cannot be denied, for it requires no further implication, deduction, or induction. If land is subject to alienation, then it is subject to taxes. With perfect title, the land enjoys the freedom to be alienated, the responsibility of being taxed, and the vulnerability to encumbrance. Thus, it is not illogical to imply alienability and taxability when a perfect fee-simple absolute estate is created by unrestricted fee-patent.

IV. Conclusion
For the reasons stated above, defendants' motions for summary judgment are GRANTED and plaintiffs' motions for summary judgment are DENIED. Accordingly, the case is DISMISSED.
IT IS SO ORDERED.
NOTES
[1] Complete summary judgment has been requested by the United States and partial summary judgment has been requested by the Saginaw Chippewa tribe, and jointly by defendants State of Michigan, Isabella County, and City of Mt. Pleasant. Joint defendants' previous motion asked to establish the extent of the reservation. However, in their brief regarding taxation, the relief requested includes the previous request plus a determination on the ultimate issue that "unrestricted fee lands located within the boundaries of the Isabella Reservation are subject to the State of Michigan's ad valorem property tax." Thus, it appears that, at this juncture, they request complete, not partial, relief.
[2] At the time the complaint was filed, ten parcels were owned by individual members of the Tribe and one parcel was owned by the Tribe.
[3] But see, City of Mount Pleasant Answer, p. 3, ¶ 7 ("without knowledge or information sufficient to form a belief and therefore neither admits nor denies the same").
[4] There remains some question as to whether the lands involved in this dispute all stem from the unrestricted patent issued to James Gruette or whether some land title stems from unrestricted patents issued to other individuals. However, the identity of the patent-holder is of no import to the instant inquiry.
[5] This portion of the treaty is commonly referred to by the parties as the "dissolution clause."
[6] U.S. v. Holliday, 70 U.S. 407, 419, 18 L.Ed. 182 (1866).
[7] But see, Oyler v. Finney, 870 F.Supp. 1018 (D.Kan.1994) (dismissing action based on lack of subject matter jurisdiction due to the tax injunction statute and the principle of comity).
[8] The degree of unmistakability that attends Congressional intent (i.e., whether clear intent to permit taxation requires use of the term taxation of whether intent to allow taxation is clear when the land is made alienable) will be examined under b(iii), which is entitled "Defining the holding in Yakima-Southern Ute."
[9] This last phrase refers to Indian country which is currently explained by case law as being land which "has been `validly set apart for the use of the Indians as such, under the superintendence of the Government.'" Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe, 498 U.S. 505, 511, 111 S.Ct. 905, 909, 112 L.Ed.2d 1112 (1991).
[10] The Court in Mescalero held that state taxation of the ski resort's gross receipts was proper. Since the income there was directly derived from the federally-owned land (i.e., the convergence of hills, winter weather, and the joyful willingness of certain enthusiasts to let gravity have its way), the Court's holding distinguished itself from prior cases which held that income derived directly from tax-exempt trust land was also exempt from tax. Mescalero, 411 U.S. at 156, 93 S.Ct. at 1274-75, noting and declining to apply the principles stated in Squire v. Capoeman, 351 U.S. at 9, 76 S.Ct. at 616-17 (which held that income directly derived from tax-exempt trust land is likewise tax-exempt).

The land in Mescalero was tax-exempt federally owned land, but was not tax-exempt trust land held for the benefit of the Indians, as it was in Squire. Since lessees of federally-owned land are not immune from income tax generally, the sole basis for any income tax immunity in Mescalero would have been the status of the lessees as Indians. However, the status of the lessees as Indians was not sufficient to render their gross receipts income immune from tax in Mescalero.
Instead, the basis for Indian income tax immunity appears to be rooted not on any relative of sovereignty but solely upon its direct derivation from tax-exempt trust land as evidenced by revenue rulings passed in 1956 to comport with the holding in Squire and the amended version therefrom which sets forth the following 5-part test for determining whether Indian income would be immune from taxation: (1) the land is held in trust by the United States; (2) the land is restricted; (3) the income is derived directly from the land; (4) statute, treaty, or other authority evinces intent the allotment be used to protect the Indian; (5) authority clearly indicates the "land is not to be taxed until conveyed in fee simple to the allottee." Critzer v. United States, 597 F.2d 708, 713, n. 19, 220 Ct.Cl. 43 (U.S. 1979), cert. denied, 444 U.S. 920, 100 S.Ct. 239, 62 L.Ed.2d 176.
Direct derivation was strictly construed such that income earned while on trust land but not from trust land or reinvested income was not afforded tax exempt status. Critzer, 597 F.2d at 713 (rejecting plaintiff's argument that income derived from a restaurant businesses, located on trust land, was directly derived from the land, contrasting Squire, where the sale of timber created income directly derived from the land). In exemplifying the limits of the doctrine, the court stated:
If plaintiff were to sit in a telephone booth on her Indian land and sell stocks and bonds by phone from the booth, it would be ludicrous to attempt to argue that any income, so earned, was directly derived from the land.
Critzer, 597 F.2d at 713
The court in Critzer also expressly rejected any claim of tax exempt status based solely on the fact that plaintiff was an Indian, noting that "If Congress wishes to exempt any class of citizens from the federal income tax, it knows how to do it. We have no authority to do so." Critzer, 597 F.2d at 714.
Thus, it appears that the only immunity afforded Indians derives from the trust relationship which in turn derives from the paternalistic role taken by the United States as guardian over the Indians as wards. See, Cherokee Nation v. Georgia, 30 U.S. 1, 8 L.Ed. 25 (1831). If the Indians enjoyed an independent tax immunity, the result in Mescalero would have been different with respect to the gross receipts tax.
This conclusion is strengthened by the fact that the Court in Mescalero held the use tax imposed on the ski lift equipment tax-exempt because the equipment had become a fixture, and thus a part of the tax-exempt land. Mescalero, 411 U.S. at 158, 93 S.Ct. at 1275.
[11] Since the statute provided for complete income tax immunity for Indians residing within reservation bounds, the statute abrogated the need to inquire whether income was directly derived from tax-exempt trust land. See, supra, n. 10.
[12] This conclusion is actually supported by Kennerly, supra, wherein the Court held that the tribal consent to state jurisdiction of criminal matters was not sufficient to confer jurisdiction upon the state of Montana. Kennerly, 400 U.S. at 426, 91 S.Ct. at 481-82. The state attempted to argue that Williams v. Lee's recognition of tribal sovereignty should support the conclusion that the tribe could create state jurisdiction by consenting thereto. The Court in Kennerly rejected that argument. Instead the Court found that the only Congressional means of creating state jurisdiction within reservation bounds required the Secretary of the Interior to conduct an election and such procedure had not been complied with by the tribe. Kennerly, 400 U.S. at 429, 91 S.Ct. at 483. If Indian sovereignty had any independent power, the result in Kennerly would have been different.
[13] The court chooses to engage in this analysis of Yakima's history  including the conclusion that holdings in these cases may well have sprung from obiter dictum  fully cognizant of the implicit irony: this portion of the court's opinion is itself dictum.
[14] This holding implies that all Indian activity carried on within reservation bounds is tax exempt, absent Congressional authority to tax. This conclusion must also rest on the precept that taxation of reservation Indians and reservation lands is precluded absent authority of Congress. Mescalero, 411 U.S. at 148, 93 S.Ct. at 1270. However, since the land in Yakima was not trust land, income directly derived from its sale would similarly lack exemption from taxation absent Mescalero/McClanahan dicta and Moe's rejection of a civil personal jurisdiction checkerboard whose squares distinguish unrestricted fee-patented lands from trust lands. Cf., supra, n. 10.
[15] The per se rule shares its origin with the precept stated in Yakima, that taxation of reservation Indians and lands is precluded absent clear Congressional intent. See, California v. Cabazon, 480 U.S. at 215, n. 17, 107 S.Ct. at 1091, n. 17, which credits Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 765, 105 S.Ct. 2399, 2402-03, 85 L.Ed.2d 753 (1985), which credits Bryan v. Itasca County, 426 U.S. 373, 392-393, 96 S.Ct. 2102, 2112-13, 48 L.Ed.2d 710 (1976), which in turn credits McClanahan v. Arizona State Tax Comm'n, supra. Accordingly, it too is subject to challenge. See, supra, part III(B)(1)(a) of this opinion.
[16] As noted earlier, the land in Mescalero was federally owned land which was leased to the Indians. As further noted, the holding was much different from the dictum contained therein. Accordingly, it presents its own unique situation. See, supra, part III(B)(1)(a) of this opinion.
[17] Pl.U.S.Br., p. 9 ("Neither the 1855, nor the 1864 Treaty, however, makes any reference to taxation.").
[18] Pl.U.S.Br., p. 10 ("taxation of reservation Indians cannot rest on an implication."). However, here it is not "reservation Indians" being taxed, it is fee-patented land.
[19] As stated earlier, this presumption against taxation absent express Congressional authority appears to have been inverted by the Court in Mescalero, supra. However, for purposes of this analysis, the court will assume its validity, as did the Court in Yakima and the parties in the instant case. Pl.U.S.Reply Br., pp. 3-4.
[20] Plaintiff United States also argues that if alienability were the touchstone of Yakima, then there would have been no need for the remand ordered therein. However, the remand in Yakima, supra, was ordered to first resolve a factual issue because "it is not clear whether the parcels at issue in this case were patented under the General Allotment Act," and if the parcels were not all patented under the Act, the court on remand was to decide "whether it makes any difference." Yakima, 502 U.S. at 269, 112 S.Ct. at 694. The Supreme Court's reluctance to launch into the legal resolution of issues which might not arise, depending on the resolution of factual issues, cannot be read as more than an effort to avoid creating dicta.
[21] Prior case law did not distinguish between the in rem and in personam jurisdiction as did the Court in Yakima and its progeny.
[22] Indian country is defined as "(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent ... (b) all dependent Indian communities within the borders of the United States ... (c) all Indian allotments, the Indian titles [restricted fees] to which have not been extinguished...." 18 U.S.C. 1151.

Its definition requires the land within reservation bounds to be "under the jurisdiction of the United States" which would imply ownership by the United States. To construe the phrase "under the jurisdiction of the United States" differently, i.e., as coterminous with Indian Country, would be circular and would render the phrase superfluous.
Case law has similarly defined Indian country as land under the control of the United States: "the test for determining whether land is Indian country does not turn upon whether that land is denominated `trust land' or `reservation.' Rather, we ask whether the area has been `validly set apart for the use of the Indians as such, under the superintendence of the Government.'" Oklahoma Tax Comm'n, 498 U.S. at 511, 111 S.Ct. at 909 (sales tax case).
[23] Indian tribal sovereignty was first recognized as a viable notion by Chief Justice Marshall in the oft-cited decision of Worcester v. Georgia, 31 U.S. 515, 8 L.Ed. 483 (1832). However, it is clear that the basis for the holding was primarily the supremacy of the United States and not Indian sovereignty. The Court found not inherent tribal sovereignty, but that the state statute was "repugnant to the Constitution, laws, and treaties of the United States" and in "direct hostility with treaties [of the United States]." Worcester, 31 U.S. at 539, 8 L.Ed. 483.

This conclusion is buttressed by references made by Chief Justice Marshall in his opinion declining federal court jurisdiction because the Cherokee nation could not be considered a foreign nation in Cherokee Nation v. Georgia, 30 U.S. 1, 8 L.Ed. 25 (1831), one year prior to Worcester. Here, Chief Justice Marshall denominated Indian tribes as "domestic, dependent nations." Id. at 17, 8 L.Ed. 25. He also stated that "they are in a state of pupilage [to the United States] ... which resembles that of ward to guardian." Id. at 17, 8 L.Ed. 25. Even more revealing is the following passage:
They look to our government for protection; rely upon its kindness and its power; appeal to it for relief to their wants; and address the President as their great father. They and their country are considered by foreign nations, as well as by ourselves, as being so completely under the sovereignty and dominion of the United States, that any attempt to acquire their lands, or to form a political connection with them, would be considered by all as an invasion of our territory, and an act of hostility.
Cherokee Nation v. Georgia, 30 U.S. at 17-18, 8 L.Ed. 25.
Nonetheless, most cases cite Worcester as an example of the days when Indian tribal sovereignty flourished, only to be lost to the perspectives of later courts. White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 141, 100 S.Ct. 2578, 2582, 65 L.Ed.2d 665 (1980) ("Long ago the Court departed from Mr. Chief Justice Marshall's view that `the laws of [a State] can have no force' within reservation boundaries.").
Today, the accepted delineation of tribal authority is found in Montana v. United States, 450 U.S. 544, 564, 101 S.Ct. 1245, 1257-58, 67 L.Ed.2d 493 (1981). The Court states that as to internal tribal matters, the tribe's power is limitless; whereas, as to external relations, tribes are powerless, unless one of two possible exceptions apply:
A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health and welfare of the tribe. Montana v. United States, 450 U.S. 544, 565-566, 101 S.Ct. 1245, 1258, 67 L.Ed.2d 493 (1981).
[24] "A doctrine of Indian tribal sovereign immunity was originally enunciated by this Court and has been reaffirmed in a number of cases. Turner v. United States, 248 U.S. 354, 358, 39 S.Ct. 109, 110, 63 L.Ed. 291 (1919)." Potawatomi, 498 U.S. at 510, 111 S.Ct. at 909.

Turner held that an Indian tribal member could not seek recovery of damages from its sovereign, the Tribe. Id. However, Turner is cited as standing for the rule that sovereign immunity protects tribes from suit by outside entities, such as states. E.g., Potawatomi, supra.
The first case to cite Turner and to expand its holding was United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940) (holding that a bankruptcy court was without jurisdiction to "adjudicate a cross-claim against the United States", implying supremacy more than immunity, but confusing matters by also concluding that "[t]hese Indian Nations are exempt from suit without Congressional authorization.").
Since a sovereign is immune only from those it governs, the only manner in which Indian tribes could stand immune from suit by non-members is to equate suit against the tribes with suit against the United States itself. However, courts have not stated the theory with candor and instead have enveloped Indian Tribes with a preternatural sovereign immunity since United States Fidelity.
[25] As noted earlier, the Court in Yakima found that the same checkerboarding in the in rem arena would not cause untenable results because the tax assessors must resort to plat maps to make parcel-by-parcel determinations anyway. Yakima, 502 U.S. at 264, 112 S.Ct. at 691.
[26] The elements in their entirety are as follows:

(1) that it is or represents an Indian tribe within the meaning of the Nonintercourse Act; (2) that the land in issue is covered by the Nonintercourse Act as tribal land; (3) that the United States has never approved or consented to the alienation of the tribal land; (4) that the trust relationship between the United States and the tribe, established by coverage of the Nonintercourse Act, has never been terminated or abandoned.
Catawba Indian Tribe, 718 F.2d at 1295.
[27] See, e.g., Catawba, supra, 718 F.2d at 1298-99 ("The Nonintercourse Act creates a trust or fiduciary relationship between the federal government and the tribe somewhat akin to the relationship of guardian and ward.").
[28] Although stated in more palatable terminology, the passage cited by the United States reveals that restricting the alienability of land based on the status of the titleholder is founded on the fear of the consequences of outright ownership:

Today, the statutory restraints on alienation of Indian land insulate the Indian lands from the full impact of market forces, preserving the Indian land base for the furtherance of Indian values. If tribal land were not subject to restraints on alienation and tax immunities, market forces and state tax assessors would eventually erode Indian ownership of the res- ervation * * * The continued enforcement of federal restrictions, in this view, derives not from a presumed incompetence of the `ward,' but from a perceived value in the desirability of a separate Indian culture and polity.
F. Cohen, Handbook of Federal Indian Law, (1982 ed. p. 509-10), as cited in Pl.U.S.Br., p. 17 (emphasis provided). To invoke demons named "market forces" and "tax assessors" is perhaps less offensive than the terms of old, i.e. "the intelligence and greed of other races." However, this cloaked mistrust of Indians is mistrust nonetheless at its core.
[29] One of the factors to be considered by the Secretary of the Interior is the impact on the state resulting from removal of the land from the tax rolls. 25 C.F.R. § 151.10(a). Of course, removal from the tax rolls contemplates the ability of the state to have taxed the land prior to it becoming trust land.
[30] Compare, Buzzard v. Oklahoma Tax Comm'n, 992 F.2d 1073, 1077 (10th Cir.1993) ("If the restriction against alienation were sufficient to make any land purchased by the UKB [United Keetoowah Band of Cherokee Indians] Indian country, the UKB could remove land from state jurisdiction and force the federal government to exert jurisdiction over that land without either sovereign having any voice in the matter. Nothing in [U.S. v.] McGowan [302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410] (1938) or the cases concerning trust land indicates the Supreme Court intended for tribes to have such unilateral power.").